AHRENS & DeANGELI, P.L.L.C.; FWP Technologies, Inc.; Edward R. Ahrens; and Daren DeAngeli, Appellants,

v.

Lawrence FLINN, Jr., Appellee.

No. 05–09–00415–CV.

Court of Appeals of Texas, Dallas.

July 27, 2010.

Rehearing Overruled Aug. 30, 2010.

Paul M. Koning, Hughes & Luce, L.L.P., Dallas, TX, for Appellants.

David W. Evans, The Law Offices of Stephen F. Malouf, P.C., Dallas, TX, for Appellee.

Before Justices MOSELEY, FITZGERALD, and LANG–MIERS.

## OPINION

Opinion By Justice MOSELEY.

Appellants the law firm of Ahrens & DeAngeli, p.l.l.c. ("Ahrens & DeAngeli" or "the law firm"); FWP Technologies, Inc.; Edward R. Ahrens; and Daren DeAngeli appeal the trial court's order denying their special appearance. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon 2008); TEX.R.APP. P. 28.1. Because we conclude the trial court erred by denying appellants' special appearance, we reverse the trial court's order and render judgment dismissing appellants from this case for lack of personal jurisdiction.

## I. APPLICABLE LAW AND STANDARD OF REVIEW

### A. Substantive Law

■■■ Texas courts may assert personal jurisdiction over a nonresident if it is authorized by the Texas long-arm statute and is consistent with federal and state constitutional due-process guarantees. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002); *see* TEX. CIV. PRAC. & REM.CODE ANN. §§ 17.041–.045 (Vernon 2008). The long-arm statute allows Texas courts to " 'reach as far as the federal constitutional requirements of due process will allow.' " *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 806 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991)); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (acts constituting "doing business" within state for purposes of long-arm statute). Thus, a Texas court may exercise personal jurisdiction over a nonresident if doing so complies with federal due-process requirements. *See Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575 (Tex.2007). Those requirements are satisfied if: (1) the nonresident defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with " 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

### 1. Nature of Contacts with Texas

■■■ The contacts relevant to a jurisdictional analysis are those through which the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (citing *Int'l Shoe Co.,* 326 U.S. at 319, 66 S.Ct. 154); *see Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). Only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. *Michiana,* 168 S.W.3d at 785. Such contacts must be purposeful rather than random, fortuitous, or attenuated. *Id.; see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 n. 18, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Further, the "defendant must seek some benefit, advantage or profit by 'availing' itself of the jurisdiction." *Michiana,* 168 S.W.3d at 785. What is important is the quality and nature of the defendant's contacts with the forum state, rather than their number. *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 806.

### 2. Extent of Contacts—Specific Jurisdiction

■■■ A nonresident defendant's contacts with the forum state meet the federal due-process minimum contacts standard if the

contacts establish either "specific jurisdiction" or "general jurisdiction." *See BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 795–96 (Tex.2002). In his brief on appeal and oral argument, Flinn abandoned his general jurisdiction grounds for personal jurisdiction over appellants. Accordingly, we limit our discussion to the trial court's implied findings concerning specific jurisdiction.

 Specific jurisdiction exists if the defendant's alleged liability arises out of or is related to the defendant's activities conducted within the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *see also CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996). In other words, there must be "a substantial connection between [the nonresident's contacts with the forum] and the operative facts of the litigation." *Moki Mac,* 221 S.W.3d at 585. Specific jurisdiction is not established merely by allegations or evidence that a nonresident committed a tort in the forum state or "directed a tort" at the forum state. *Michiana,* 168 S.W.3d at 790–92.

### 3. Additional Due–Process Requirements

 Federal due-process also requires the exercise of personal jurisdiction to comport with traditional notions of fair play and substantial justice. *BMC Software Belg., N.V.,* 83 S.W.3d at 795 (citing *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154).[1]

## B. Burden of Pleading/Proof

### 1. In General

 The plaintiff bears the initial burden of pleading sufficient allegations to invoke the provisions of the Texas long-arm statute. *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 807; *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985) (citing *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 438 (Tex.1982)). To determine whether the plaintiff satisfied its pleading burden, and to determine the basis for jurisdiction alleged by the plaintiff, a court considers the allegations in the plaintiff's petition as well as its response to the defendant's special appearance. *Flanagan v. Royal Body Care, Inc.,* 232 S.W.3d 369, 374 (Tex. App.-Dallas 2007, pet. denied); *see* Tex.R. Civ. P. 120a(3). Except as noted below, upon filing a special appearance the nonresident defendant assumes the burden of negating all bases of personal jurisdiction alleged by the plaintiff. *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 807; *Siskind,* 642 S.W.2d at 438 (citing E. Wayne Thode, *In Personam Jurisdiction; Article 2031b, The Texas "Long Arm" Jurisdiction Statute; And the Special Appearance to Challenge Jurisdiction in Texas and Elsewhere,* 42 Tex. L.Rev. 279, 322 (1964)). In other words, the defendant must disprove the existence of minimum contacts sufficient to establish personal jurisdiction over it—general, specific, or both—as alleged

---

1. In making this determination we evaluate the defendant's contacts in light of the following factors: (1) the burden on the nonresident defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *See Burg-* er King Corp., 471 U.S. at 477, 105 S.Ct. 2174; *World–Wide Volkswagen Corp.,* 444 U.S. at 292, 100 S.Ct. 559; *Guardian Royal Exch. Assurance, Ltd.,* 815 S.W.2d at 231. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assurance, Ltd.,* 815 S.W.2d at 231.

by the plaintiff. *See Am. Type Culture Collection, Inc.*, 83 S.W.3d at 807; Thode, *supra* at 322. However, absent allegations of any specific, purposeful act through which the defendant can be said to have sought a benefit by "availing itself of the jurisdiction," *Michiana*, 168 S.W.3d at 785, evidence that a defendant is a nonresident is sufficient to meets its burden. *See Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 633 (Tex.App.-Dallas 1993, writ denied) (citing *Siskind*, 642 S.W.2d at 438).

### 2. Alter–Ego or Single Business Enterprise Theories

■■ If the plaintiff seeks to assert jurisdiction over a nonresident defendant under an alter-ego theory, the plaintiff has the burden of proving its alter-ego allegation. *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007). In the context of a parent and subsidiary corporation, the supreme court outlined the factors relevant to jurisdictional veil-piercing as follows:

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiff must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*Id.* at 175 (quoting *BMC Software Belg., N.V.*, 83 S.W.3d at 799).

Additionally, the Texas Supreme Court has rejected the single business enterprise theory of liability. *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 456 (Tex.2008). However, veil-piercing for purposes of liability is distinct from imputing one entity's contacts with a forum to another entity for jurisdictional purposes. *PHC–Minden, L.P.*, 235 S.W.3d at 174. When addressing a claim that a corporate entity was subject to jurisdiction in Texas based on the actions of another entity that, along with the first entity, was asserted to constitute a single business enterprise, the supreme court relied on the jurisdictional veil-piercing factors set out in *BMC Software Belgium, N.V. Id.* at 175.

### C. Standard of Review

■■ Whether personal jurisdiction exists is a question of law, and we review the trial court's ruling on a special appearance de novo. *BMC Software Belg., N.V.*, 83 S.W.3d at 794. However, the trial court must frequently resolve fact questions before deciding the jurisdictional question. *Id.* If—as here—the trial court does not issue findings of fact, we imply all such findings necessary to support the judgment that are supported by the evidence. *See id.* at 795. However, when a reporter's record is included in the appellate record, the trial court's findings of fact—express or implied—are not conclusive, and are subject to challenge on evidentiary sufficiency grounds. *See id.* A legal sufficiency challenge to a finding of fact fails if there is more than a scintilla of evidence to support the finding. *See id.* In conducting a factual sufficiency review, we may set aside the trial court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Hoffmann v. Dandurand*, 180 S.W.3d 340, 345 (Tex.App.-Dallas 2005, no pet.).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Lawrence Flinn, Jr. is a Florida resident. Ahrens is a resident of Seattle with his principal place of business in Seattle. DeAngeli is a resident of Boise, Idaho,

with his principal place of business in Boise. Their law firm, Ahrens & DeAngeli, was organized under the laws of the State of Washington, with its principal place of business in Seattle. FWP Technologies, Inc. was organized under the laws of the State of Nevada with its principal place of business in Eagle, Idaho. We take the following information from Flinn's Sixth Amended Petition, other pleadings, and undisputed evidence.

According to Flinn, this case arose from the creation, promotion, and sale to Flinn of illegal and fraudulent tax shelters by Gary Morton Kornman, a Texas resident, and Heritage Organization L.L.C., which has an office in Dallas. Flinn alleged that Ahrens and DeAngeli initially conceived a tax shelter strategy—known as the "752 strategy"—to avoid capital gains tax liability. Ahrens and DeAngeli formed FWP Technologies, Inc. to receive payments from Kornman for sales of the strategy to high income "targets." Flinn alleged he received information packets and, in the summer of 2000, attended several meetings with Kornman. In August 2000, the Internal Revenue Service issued a notice cautioning tax professionals that 752 strategies were abusive and would be disallowed, and users would face civil and criminal penalties. Although Flinn negotiated with Kornman and Heritage about purchasing the strategy, and ultimately purchased it in October 2000, he alleged that Kornman did not tell him about the IRS notice.

Subsequently, Flinn was audited by the IRS, which determined that he had participated in the noticed strategy. Flinn settled with the IRS, paying back taxes, penalties, and interest. He brought suit against Kornman and appellants, alleging they fraudulently induced him to enter into the tax shelter transaction. He alleged he would not have used these tax shelters but for Kornman's and appellants' concealment that the tax shelters were abusive and subject to the IRS notice. Specifically, Flinn alleged appellants conspired with Kornman to defraud him and "assisted in and benefitted from the false and fraudulent representations" that induced him to enter into the tax shelter transactions. Flinn alleged that appellants "knew that Kornman's representations to [Flinn] regarding the legality of the shelters were false" and knew Flinn "was soliciting clients for them and developing fees for them." He asserted the following causes of action: breach of fiduciary duty, fraud, negligence, negligence per se, negligent misrepresentation, negligent failure to warn, gross negligence, and money had and received.

Appellants filed a verified special appearance and attached evidence to their amended brief in support of their special appearance. Flinn filed a response supported by evidence.[2] Subsequently, the trial court denied appellants' special appearance, without issuing findings of fact. This appeal followed.

## III. ANALYSIS

In four issues, appellants contend the trial court erred in denying their special appearance because the evidence is legally and factually insufficient to support implied findings of facts giving rise to general and specific jurisdiction over appellants that meets the standards of fair play and substantial justice. (As noted earlier,

---

**2.** Appellants and Flinn objected to some of the evidence. At the special appearance hearing, the trial court sustained some objections and overruled others, and some evidence was admitted only for purposes of the special appearance. There are no issues on appeal related to the trial court's evidentiary rulings.

Flinn no longer argues Texas courts have general jurisdiction over appellants.)

We review the allegations and evidence as to each appellant's contacts and determine whether the evidence supports an implied finding in favor of a particular jurisdictional fact. *See BMC Software Belg., N.V.,* 83 S.W.3d at 794. We then review de novo the trial court's decision that the exercise of personal jurisdiction over that appellee complies with federal due-process requirements. *See Moki Mac,* 221 S.W.3d at 575; *BMC Software Belg., N.V.,* 83 S.W.3d at 794.

## A. Jurisdictional Allegations

Flinn alleged that appellants are nonresidents engaging in business in Texas, but not maintaining a regular place of business in Texas or a designated agent for service of process. Flinn alleged that the trial court had jurisdiction over appellants because, pursuant to section 17.042 of the civil practice and remedies code, they contracted to perform services in whole or in part in Texas and committed torts in whole or in part in Texas. Flinn also alleged that appellants "constituted a single business enterprise or were the alter-ego of one another or were a joint venture or a joint enterprise so as to make each liable for the actionable conduct of the other." In addition, he alleged that FWP was the agent of the other appellants. Flinn also alleged in his petition that appellants and Kornman "constituted a single business enterprise or were the alter-ego of one another or were a joint venture or a joint enterprise so as to make each liable for the actionable conduct of the other."

In his response to appellants' special appearance, Flinn argued that Ahrens and DeAngeli acted as counsel for Heritage from 1997 to 2002 and that Heritage made payments to the law firm. He also asserted that appellants, beginning in 1998, "assist[ed], collud[ed] with and conspir[ed]

with" Kornman in the design and marketing of an abusive tax shelter that defrauded him into paying fees to implement the tax shelter. Specifically, Flinn asserted that appellants and Heritage engaged in a "scheme" in which Ahrens designed the 752 strategy. Ahrens and DeAngeli formed FWP and transferred tax strategies, including the 752 strategy, to it. FWP sold the strategies to Heritage, sent invoices to Heritage, and received payments. According to Flinn, Ahrens and another law firm attorney prepared 752 strategy materials such as slides and Power Point presentations to promote the tax shelters. These materials were discussed in telephone conversations and teleconferences with Kornman and other Heritage personnel, and they were sent to Heritage by fax and mail. In addition, as part of the scheme, Flinn alleged that Ahrens, DeAngeli and the law firm would refer clients to Heritage; Heritage would buy an abusive tax strategy from FWP and sell it to the client; Heritage would refer the client to the law firm for a tax opinion, for a fee to the law firm; and when the client implemented the tax strategy, Heritage would send a "secret kickback" to FWP for having used an FWP strategy. According to Flinn, these acts were documented in the law firm's billing records showing communications between its attorneys and Heritage personnel, faxes, an opinion letter to another Texas client, and FWP's invoices.

Flinn also relies on an October 1999 trip Ahrens made to Heritage's Dallas office, a letter and invoice from DeAngeli to Heritage in advance of the trip, and a cell phone with a Dallas area code from Kornman to Ahrens for his use for Heritage business.

## B. Basic Jurisdictional Facts as to Each Appellant

Ahrens's affidavit established that no appellant: (1) entered into any contract with

Flinn; (2) had contact of any kind with Flinn, inside or outside Texas, before Flinn sued appellants; (3) received, directly or indirectly, a payment from Flinn; (4) recruited Texas residents, directly or through an intermediary located in Texas, for employment inside or outside Texas; (5) maintained an office or place of business in Texas, or had any employees, servants, or agents within Texas; (6) was required to maintain or maintained a registered agent for service of process in Texas; (7) owned, leased, rented, or controlled any real or personal property within Texas, or maintained any bank accounts in Texas; (8) paid any state, county, or city taxes, fees, or assessments; (9) had a telephone listing, post office, or any other mailing address in Texas; (10) had been sued in Texas or previously availed itself of the jurisdiction of Texas courts; (11) advertised in Texas; or (12) entered into any transaction with a person in Texas from 1995 to October 2008 (the date of the affidavit), except as described elsewhere in Ahrens's affidavit.

## C. DeAngeli's Special Appearance and Evidence

DeAngeli's affidavit established that he was a resident of Idaho since 1991 and was a founding member of the law firm. Since forming the law firm, he had represented "only a small number of clients" who resided in or had an office in Texas. Without exception, each of those clients, directly or through an intermediary, first contacted him or others at the law firm in Idaho or Washington and sought the law firm's representation. With one exception, DeAngeli never visited any of the clients in Texas, and communications with the Texas client were carried out by personal meetings in Idaho or Washington, telephone calls or faxes to or from Idaho or Washington, mail or delivery of documents to or from Idaho or Washington, and electronic communications between DeAngeli and other attorneys in the law firm's Idaho or Washington offices. The single exception was a 1999 vacation in which DeAngeli had dinner with a Heritage employee and met for one hour with other Heritage employees at Heritage. During these meetings, no business was conducted and only social matters were discussed.

## D. Ahrens's Special Appearance and Evidence

Ahrens's affidavit established that he was licensed to practice law in Idaho and Washington and, until he moved to Idaho in 2002, he was a resident of Washington State. Ahrens had never resided in Texas. Since forming Ahrens & DeAngeli, Ahrens had represented "only a small number of clients" residing or with offices in Texas. Without exception, each of these clients, directly or through an intermediary, first contacted Ahrens or others at the law firm in Idaho or Washington and sought the law firm's representation. With the exceptions noted below, communications with the Texas client were carried out by personal meetings in Idaho or Washington, telephone calls or faxes to or from Idaho or Washington, mail or delivery of documents to or from Idaho or Washington, and electronic communications with him or other attorneys in the Idaho or Washington offices of the law firm.

Ahrens took three trips to the law firm client's Heritage's Texas office as follows. The first trip occurred in October 1999, to provide legal advice to Heritage representatives regarding a prospective Heritage client in California. Ahrens traveled to Texas at Heritage's request and spent three days in Texas. According to Ahrens, the 752 strategy was a topic of the meeting. During this meeting, Heritage loaned Ahrens a cell telephone with a Dallas area code. Ahrens used the telephone

until 2001 for confidential communications to Heritage. Another law firm attorney overlapped Ahrens's visit regarding the prospective California client. The second trip occurred in September 2001. After meeting an attorney about a non-Heritage matter, Ahrens met at Heritage's offices for a day and a half to review new estate planning and tax strategies marketed by other companies. The third trip occurred in May 2002, to advise Heritage about new estate planning and tax strategies. According to Ahrens, none of his visits to Texas had anything to do with Flinn, and at no time during any of his visits to Texas did he discuss with Heritage anything about Flinn or his tax planning strategies.

### E. The Law Firm's Special Appearance and Evidence

Ahrens's affidavit established that he was a founding member of Ahrens & DeAngeli, a law firm with offices in Boise and Seattle. The law firm was organized in 1997 under the laws of Washington State. Since its founding, the law firm represented approximately thirteen clients residing in or located in Texas. In each case, the client or its intermediary sought out the law firm in Idaho or Washington. All legal services for the Texas-based clients were performed outside Texas, and all communications with the Texas-based clients were conducted by long-distance telephone call, fax, mail delivery, or electronic communications from outside Texas. With the exception of Ahrens's trips to Texas described above, the only trips to Texas by a law firm attorney or representative were: (1) a 2006 visit by an attorney to Austin lasting "only a few hours" on behalf of a non-Heritage client that was not a Texas resident; and (2) during a May 1999 vacation trip, an attorney had dinner with a Heritage employee and met for one hour with Heritage employees at Heritage offices, and meetings and discus-

sions with were "entirely social" and had nothing to do with Flinn.

### F. FWP Technologies, Inc.

Ahrens's affidavit established FWP was incorporated in 1998 in Nevada and has never been incorporated in Texas. Ahrens has been its president since its incorporation. Ahrens formed FWP to sell intellectual property relating to tax and estate planning techniques, separate and apart from the practice of law, and no FWP employee, officer, director, or representative had ever traveled to or attended any meetings in Texas on behalf of FWP. FWP sold "a number of different estate and tax planning techniques to Heritage," including, in 1998, the 752 strategy. All conveyances to Heritage were accomplished by mail delivery, electronic communication, or long distance telephone calls between Washington or Idaho and Texas. Heritage paid FWP a percentage of the fees Heritage generated from its sales of planning techniques, including the 752 strategy, similar to a licensing fee or royalty. After the law firm stopped writing opinion letters regarding the 752 strategy in February 2000, the only payments FWP received from Heritage were from Heritage clients who implemented the 752 strategy in 1998 and 1999 and paid their Heritage fees later.

DeAngeli's affidavit established that he was an original shareholder and secretary of FWP, but sold his stock in December 1999. After the sale, he did not receive any distributions or compensation of any kind from FWP.

### G. Discussion

 It is undisputed that the relationship between appellants and Heritage included both the legal representation of Heritage and the development and mar-

keting to Heritage of the 752 strategy. We consider the contacts Flinn relies on in light of these two relationships, legal and business, and as to each appellant. We begin by addressing appellants' first issue, that their contacts with Texas do not support the purposeful availment element of personal jurisdiction.

### 1. Legal Representation

To establish that Ahrens, DeAngeli, and the law firm purposefully availed themselves of the privilege of conducting activities in Texas, Flinn relies on the following evidence of their legal representation of Heritage: the law firm's billing records showing telephone calls, teleconferences, faxes, and invoices from the law firm's individuals, including Ahrens and DeAngeli, to Heritage employees; payments from Heritage to the law firm totaling over $2 million; Ahrens's, DeAngeli's, and other law firm attorneys' visits to Texas; and Ahrens's and DeAngeli's discussion of a draft opinion letter regarding the 752 strategy with a Heritage employee. In the case of nonresident-defendant lawyers, the "mere existence of an attorney-client relationship, unaccompanied by other sufficient contacts with the forum, does not confer personal jurisdiction over the nonresident in the forum state; more is required." *Klenk v. Bustamante*, 993 S.W.2d 677, 682 (Tex.App.-San Antonio 1998, no pet.) (quoting *Sawtelle v. Farrell*, 70 F.3d 1381, 1392 (1st Cir.1995)), *overruled on other grounds by BMC Software Belg., N.V.*, 83 S.W.3d at 794; *see Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir.1986) ("merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction"). For example, the nonresident attorney must take affirmative action to promote business within the forum state. *Klenk*, 993 S.W.2d at 682 (citing *Sher v. Johnson*, 911 F.2d 1357, 1363 (9th Cir.1990); *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir.1988)). Telephone calls and correspondence as activities directed at the forum state are generally insufficient. *Id.* (citing *Sawtelle*, 70 F.3d at 1391; *Sher*, 911 F.2d at 1362–63); *see Holt Oil & Gas Corp.*, 801 F.2d at 778. Not even isolated trips to the forum state during the representation, when coupled with the long-distance communication, amount to activities directed at the forum state. *Klenk*, 993 S.W.2d at 682 (citing *Sher*, 911 F.2d at 1363).

The mere existence of an attorney-client relationship between the out-of-state attorneys here and Heritage does not confer personal jurisdiction, and there is no evidence that Ahrens, DeAngeli, or any member of the law firm promoted or solicited business in Texas. *See id.; see also Holt Oil & Gas Corp.*, 801 F.2d at 778. The record shows that their legal work on behalf of Heritage and another Texas client was performed in Washington or Idaho, not Texas, and the communications were made from there to Texas. *See Klenk*, 993 S.W.2d at 682; *see also Holt Oil & Gas Corp.*, 801 F.2d at 778; *Proskauer Rose LLP v. Pelican Trading, Inc.*, No. 14–08–00283–CV, 2009 WL 242993, at *3–4 (Tex. App.-Houston [14th Dist.] Feb. 3, 2009, no pet.) (mem.op.) (review of transactions and providing opinion letter and other documents by out-of-state attorneys to Texas client insufficient for specific jurisdiction). There is no evidence that appellants received any payments in Texas for any legal representation in Texas. Ahrens's October 1999 trip to Texas on the matter of legal counsel for Heritage is an "isolated trip" which does not amount to an activity directed at Texas. None of DeAngeli's or other law firm attorneys' visits to Texas involved Heritage's legal matters. *See Klenk*, 993 S.W.2d at 682; *see also Star Tech., Inc. v. Tultex Corp.*, 844 F.Supp. 295, 298–99 (N.D.Tex.1993) (mailing plead-

ings to Texas and two trips to Texas in relation to out-of-state attorney's legal representation of Texas client insufficient for specific jurisdiction). The evidence is that the contacts related to appellants' legal representation of Heritage are not the type of contacts that show any appellant purposefully availed itself of the benefits and protections of Texas law.

### 2. Sale and Marketing of 752 Strategy

To establish that Ahrens, DeAngeli, and FWP purposefully availed themselves of the privilege of conducting activities in Texas, Flinn relies on the following evidence of the development and marketing of the 752 strategy: purchase agreements between Ahrens and DeAngeli and, subsequently, FWP and Heritage for use of the 752 strategy; invoices from FWP to Heritage for its use of the 752 strategy by Heritage clients and payments from Heritage to FWP; preparation of Power Point illustrations of the 752 strategy for Heritage's presentation to its clients, including Flinn; faxing these illustrations to Heritage personnel, including Kornman; explanations of the 752 strategy to Heritage personnel in telephones calls and faxes; and a legal opinion on tax planning for and payment from another client in Texas.

It is undisputed that Ahrens and DeAngeli had an agreement to communicate the 752 strategy to Heritage, prepared or directed others to prepare materials explaining the strategy to Heritage's clients, and created FWP through which to receive payments for Heritage's clients' use of the 752 strategy. However, as discussed below, the contacts related to the development and promotion of the 752 strategy to Heritage are not the type of contacts that show any appellant purposefully availed itself of the benefits and protections of Texas law.

As noted above, merely contracting with a Texas entity is insufficient to show purposeful availment. *See Holt Oil & Gas Corp.*, 801 F.2d at 778. Also as noted above, the record shows that the work of developing the 752 strategy was performed in Washington or Idaho, not Texas, and the communications about it were made from there to Texas. *See Klenk*, 993 S.W.2d at 682; *see also Holt Oil & Gas Corp.*, 801 F.2d at 778. There is no evidence that appellants received any payments for the 752 strategy in Texas.

 Flinn also relies on a provision in the FWP/Heritage purchase agreements that Texas law governs the relationship. However, the record contains only such agreements signed by Ahrens or DeAngeli, but none signed by a Heritage representative. Thus, reliance on a draft agreement, or one executed by one party, that does not show an agreement that Texas law governs, especially where performance of the agreement occurred in Washington or Idaho, is misplaced. *Cf. Holt Oil & Gas Corp.*, 801 F.2d at 778.

In advance of Ahrens's October 1999 trip to Texas, DeAngeli sent a letter on behalf of FWP to Heritage referring to an FWP invoice to Heritage for $1 million for "[p]roprietary estate planning techniques" and a proposed purchase agreement between FWP and Heritage and stating that Ahrens would present the invoice and the purchase agreement to Heritage in Dallas. Flinn contended that Ahrens discussed a 752 strategy transaction with Kornman and others at Heritage. However, as noted above, telephone calls and correspondence as activities directed at the forum state are generally insufficient, and Ahrens's October 1999 trip to Texas on the matter of legal counsel for Heritage is an "isolated trip" that does not amount to an activity directed at Texas. *See Klenk*, 993 S.W.2d at 682. At the meeting, Kornman

gave Ahrens a cell telephone with a Dallas area code for his use on Heritage business. But the record shows merely that Ahrens performed contract obligations outside the forum state. *See id.; see also Holt Oil & Gas Corp.*, 801 F.2d at 778.

■ Additionally, to the extent Flinn seeks to assert personal jurisdiction over Ahrens, DeAngeli, or FWP on agency principles or because they were a single business enterprise, alter ego, or joint enterprise one with another, such personal jurisdiction bases fail because no appellant's contacts rise to the level of purposeful availment. Also, to the extent Flinn seeks to assert personal jurisdiction under an alter-ego or other jurisdictional veil-piercing theory between any appellant and Kornman, Flinn failed to produce proof of this allegation, thus failing to carry his burden to prove such allegations. *See PHC–Minden, L.P.*, 235 S.W.3d at 173.

■ Lastly, to the extent Flinn relies on any appellant's participation in Heritage/Kornman's alleged scheme using the 752 strategy to defraud Flinn to establish personal jurisdiction over that appellant, we reject his argument. In *National Industrial Sand Association v. Gibson*, 897 S.W.2d 769, 773 (Tex.1995) (orig.proceeding), the Texas Supreme Court declined to recognize the assertion of personal jurisdiction over a nonresident defendant based solely on the effects or consequences of an alleged conspiracy with a resident of the forum state. *See Siskind*, 642 S.W.2d at 434, 437–38; *Carone v. Retamco Operating, Inc.*, 138 S.W.3d 1, 10 (Tex.App.-San Antonio 2004, pet. denied). Rather than a "conceptual device," jurisdiction must be based on whether a defendant itself purposefully established minimum contacts that satisfy due process. *See Gibson*, 897 S.W.2d at 773; *Carone*, 138 S.W.3d at 10. Accordingly, personal jurisdiction premised on the alleged 752 strategy scheme to

defraud Flinn cannot be established by attributing Heritage's acts as an alleged co-conspirator to appellants. *See Carone*, 138 S.W.3d at 10 (stating "the Texas Supreme Court has foreclosed the use of a conspiracy allegation to support jurisdiction"). Only a nonresident's own contacts with the forum are relevant. *See Michiana*, 168 S.W.3d at 785.

We have reviewed the record and conclude that the evidence relates to a contact that is not the type of contact that shows any appellant purposefully availed itself of the benefits and protections of Texas law. *See Michiana*, 168 S.W.3d at 785. Thus, there is no evidence supporting an implied finding of purposeful availment by any appellant. We resolve appellants' first issue in their favor.

Because the nature of the contacts does not show purposeful availment, we need not discuss the extent of the contacts, that is, whether there is a substantial connection between any appellant's contacts with the forum and the operative facts of the litigation, or whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *See Int'l Shoe Co.*, 326 U.S. at 316, 66 S.Ct. 154; *Moki Mac*, 221 S.W.3d at 585; *BMC Software Belg., N.V.*, 83 S.W.3d at 795. Therefore, we need not address appellants' remaining three issues.

## IV. CONCLUSION

We have reviewed the evidence as to each appellant's contacts and have determined the evidence does not support an implied finding in favor of each particular jurisdictional fact. *See BMC Software Belg., N.V.*, 83 S.W.3d at 794. We conclude appellants negated the existence of contacts between each of them and the State of Texas sufficient to support the exercise of personal jurisdiction. Therefore, the trial court improperly concluded

that the exercise of personal jurisdiction over appellants complies with federal due-process requirements. *See Moki Mac*, 221 S.W.3d at 575; *BMC Software Belg., N.V.*, 83 S.W.3d at 794. We reverse the trial court's order denying appellants' personal appearance and render judgment dismissing appellants from this case for lack of personal jurisdiction.