Emma Lee DOYLE, Appellant,

v.

KONTEMPORARY BUILDERS, INC., Jaspreet S. Bains, and Elegant Improvements, LLC, Appellees.

No. 05–10–01510–CV.

Court of Appeals of Texas, Dallas.

May 8, 2012.

Rehearing Overruled June 6, 2012.

---

450

Grey Pierson, Pierson & Behr, Attorneys, Arlington, TX, for Appellant.

Michael Brian Jaskowak, The Franklin Law Firm, Grapevine, TX, for Appellee.

Before Justices MORRIS, FILLMORE, and MYERS.

## OPINION

Opinion By Justice MYERS.

This is an appeal brought by appellant Emma Lee Doyle (Doyle), against appellees Kontemporary Builders, Inc. (KBI), Jaspreet S. Bains (Bains), and Elegant Improvements, LLC (Elegant), following a bench trial on various claims, including an alleged violation of the Texas Uniform Fraudulent Transfer Act (TUFTA). In two issues, Doyle argues the trial court erred by failing to grant judgment in her favor on her TUFTA claim, and the trial court erred by failing to grant judgment in her favor on her claim of "sham corporation." We affirm the trial court's judgment.

### BACKGROUND AND PROCEDURAL HISTORY

KBI is a Texas corporation and Elegant is a Texas limited liability company. Bains is the owner of KBI and Elegant. On September 11, 2002, KBI entered into an agreement with Doyle, who owned a home in Plano, Texas, to install a cover over her backyard patio for $7000. In October of that year, the agreement was modified and expanded to include an insulated roof on top of the patio cover for an additional $800. On February 24, 2003, the patio cover collapsed following a severe snow storm. Appellant had paid $2100 of the agreed purchase price but refused to pay the balance.

KBI sued Doyle to collect the amount due to KBI in *Kontemporary Builders, Inc. v. Emma Lee Doyle*, cause 003–01862–2006, in County Court at Law No. 3

of Collin County, Texas. The parties went to mediation on December 21, 2006 and entered into a partial settlement agreement. Pursuant to the partial settlement agreement, the parties agreed to each submit a list of seven names of suggested professional engineers to the mediator, who then chose a neutral expert to review the cause of the patio cover's collapse and submit a report. The parties agreed to be bound by the engineer's report. The engineer ultimately selected by the mediator, Tony H. Childress of Childress Engineering Services, Inc., had been suggested by KBI. In the written report he submitted to the parties on February 3, 2008, the engineer found the original patio cover had been inadequately designed and improperly installed by KBI.

When the mediation resumed on June 11, 2008, the parties did not agree to a settlement. Several weeks after the failed mediation, on June 30, 2008, Bains formed a new entity, Elegant, which, like KBI, was owned and operated by Bains. Bains transferred all of KBI's assets to Elegant and began operating his business under the name of Elegant.

On July 8, 2008, Doyle sued KBI in *Emma Lee Doyle v. Kontemporary Builders, Inc.*, cause 003–01850–2008, in County Court at Law No. 3. On December 31 of that year, Doyle amended her pleadings to add Elegant and Bains as defendants for alleged violation of TUFTA and for "alter ego/sham corporation." Following a bench trial that was held on July 10, 2010, the trial court rendered judgment against KBI based on Doyle's DTPA claim and for attorney's fees. But Doyle did not prevail against Elegant and Bains on her TUFTA and "alter ego/sham corporation" claims. The court's findings of fact and conclusions of law, which were signed on October 19, 2010, read as follows:

1. Kontemporary Builders, Inc. engaged in deceptive trade acts or practices that were the producing cause of damages to Emma Lee Doyle, damages in the amount of $11,660.50.

2. Doyle's reasonable and necessary attorney's fees, through trial, are $39,535.

3. Conditional attorney fee awards for appeal, petition for writ of error, and grant of petition are, respectively, $7,500, $4,000, and $7,500 in the event the defendant appeals but is unsuccessful.

4. Doyle's claims, because they were originally filed within the applicable period of limitation and preserved both by contract with Kontemporary as well as applicable law, aren't time barred.

5. Jaspreet S. Bains neither

  * conspired with Elegant Interiors, LLC

  * engaged in any fraudulent transfer to Elegant Interiors,

  * nor was he either the alter-ego of Elegant Interiors.

## DISCUSSION
### *TUFTA*

In her first issue, Doyle asserts Bains created Elegant to defraud Doyle and other creditors, and that the trial court erred by failing to grant judgment in her favor based on her TUFTA claim. We construe this as a challenge to the trial court's fifth finding of fact. *See City of Pasadena v. Gennedy*, 125 S.W.3d 687, 691 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (construing appellant's challenges, which did not specify to which findings of fact or conclusions of law they related, to attack pertinent findings and conclusions supporting complained-of aspects of judgment); *see also* TEX.R.APP. P. 38.1(f), 38.9.

Findings of fact in a case tried to the court have the same force and effect as

jury findings. *See Pulley v. Milberger,* 198 S.W.3d 418, 426 (Tex.App.-Dallas 2006, pet. denied). When, as in this case, we have a complete reporter's record, the court's fact-findings are not conclusive and are subject to challenge on evidentiary sufficiency grounds. *See BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002); *Ahrens & DeAngeli, P.L.L.C. v. Flinn,* 318 S.W.3d 474, 479 (Tex.App.-Dallas 2010, no pet.).

■■■ When an appellant attacks the legal sufficiency of an adverse finding for which it did not have the burden of proof, it must demonstrate there is no evidence to support the adverse finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). Such a challenge fails if there is more than a scintilla of evidence to support the finding. *Ahrens & DeAngeli,* 318 S.W.3d at 479. Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *See Kroger Tex. Ltd. v. Suberu,* 216 S.W.3d 788, 793 (Tex.2006). When a party challenges the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate the evidence conclusively established all vital facts in support of the issue. *See McCord v. Goode,* 308 S.W.3d 409, 413 (Tex.App.-Dallas 2010, no pet.) (citing *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001)). We first examine the record for evidence supporting the finding. *Id.* If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.*

■■■ In conducting a factual sufficiency review, we may set aside a trial court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Ahrens & DeAngeli,* 318 S.W.3d at 479. When

conducting a factual sufficiency review of a trial court's finding, we will not pass on the credibility of the witnesses or substitute our judgment for that of the trier of fact. *See Pulley,* 198 S.W.3d at 427. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *See id.*

TUFTA section 24.005(a) provides that a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed, or reasonably should have believed the debtor would incur, debts beyond the debtor's ability to pay as they became due. TEX. BUS. & COM.CODE ANN. § 24.005(a)(1), (2) (West 2009).

■■■ The judgment creditor has the burden to prove the fraudulent transfer by a preponderance of the evidence. *Walker v. Anderson,* 232 S.W.3d 899, 913 (Tex. App.-Dallas 2007, no pet.); *G.M. Houser, Inc. v. Rodgers,* 204 S.W.3d 836, 842 (Tex. App.-Dallas 2006, no pet.). It is the creditor's burden to offer evidence addressing the elements of fraudulent transfer as to each transfer. *Walker,* 232 S.W.3d at 913; *G.M Houser,* 204 S.W.3d at 843.

■■■ "Ordinarily, whether the transfer was made with the actual intent to defraud creditors is a fact question."

*Walker,* 232 S.W.3d at 914. Direct proof of a fraudulent intent is often unavailable, so circumstantial evidence may be used to prove fraudulent intent. *Id.; G.M. Houser,* 204 S.W.3d at 842; *Mladenka v. Mladenka,* 130 S.W.3d 397, 405 (Tex.App.-Houston [14th Dist.] 2004, no pet.). TUFTA section 24.005(b) sets out a non-exclusive list of "badges of fraud" to be considered in determining whether a transfer was made with actual intent to defraud. *Walker,* 232 S.W.3d at 914; *G.M. Houser,* 204 S.W.3d at 842. They include:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com.Code Ann. § 24.005(b). Under TUFTA, "reasonably equivalent value" is defined as including, "without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." *Id.* § 24.004. Value is determined as of the date of the transfer. *Mladenka,* 130 S.W.3d at 407.

■■■ An individual badge of fraud is not conclusive but a concurrence of many badges of fraud in the same case can make a strong case of fraud. *See G.M. Houser,* 204 S.W.3d at 843; *see also Tex. Sand Co. v. Shield,* 381 S.W.2d 48, 53 (Tex.1964). While evidence of a transfer to an insider is one factor to consider in determining actual intent to defraud, that fact alone does not support a conclusion the transfer constitutes a fraudulent transfer. *See G.M. Houser,* 204 S.W.3d at 843. Fraudulent intent is deduced from facts and circumstances that "the law considers as mere badges of fraud and not fraud per se," so "these must be submitted to the trier of fact, which draws the inference as to the fairness or fraudulent characterization of the transaction." *Flores v. Robinson Roofing & Const. Co., Inc.,* 161 S.W.3d 750, 755 (Tex.App.-Fort Worth 2005, pet. denied).

■■■ The record does not indicate the date on which KBI transferred its assets to Elegant. Bains testified that he created the new company, Elegant, on June 30, 2008, and that "[t]hereabouts, not exactly that date, but thereabouts," he stopped "doing business" (or as he put it, stopped "making sales")[1] as KBI and started doing business under the name of Elegant.

Bains offered several reasons for this action. First, he testified that he was trying to avoid paying a fifteen percent royalty obligation to his franchisor, Four

---

**1.** Bains explained that "[w]hen I say stop
doing business, it's stop making sales."

Seasons Sunrooms. Bains explained that KBI's franchise agreement with Four Seasons, which required KBI to pay Four Seasons a fifteen percent royalty fee "on the product line ... and those types of things," had already expired, and that, in order to limit his liability, he decided to set up a new entity that sold only Four Seasons products. He stated that he wanted "a fresh start with Four Seasons by setting up a separate entity just to do Four Seasons products," and he hoped his "old business would be grandfathered and they [Four Seasons] would not come after that for a 15 percent royalty fee and those types of things."

Bains also testified that he stopped doing business as KBI because the company was burdened with debt. The relevant portion of the record reads as follows:

> Q. [DOYLE'S TRIAL COUNSEL]: Didn't you tell me at your deposition that you stopped doing business as KBI because the company had acquired debts beyond what the company could ever think of resolving?
>
> A. [BAINS:] Yes.
>
> Q. Okay. And we had—except for the debt to Mrs. Doyle and the disputed charge from the Star Telegram, actually you had either resolved or are resolving all of those debts, right?
>
> A. I was trying to, yes.

Doyle's trial counsel took up this issue again on redirect:

> Q. Okay. All right. Now, isn't it also true that the only creditors of KBI that you have intentionally refused pay are the Star Telegram and my client, Emma Lee Doyle?

A. Specifically refused, I have not paid AT & T or other bills either.

> Q. I'm talking about those you intentionally refused to pay—
>
> A. That's right.
>
> Q. —are my client and the Star Telegram, correct?
>
> A. That's right.

Bains also acknowledged he earned $100,000 "in salary profit distribution" from KBI in 2007, six months before he "shut the company down." [2]

Another reason offered by Bains for why he "set up" Elegant on June 30, 2008, was his father's belief that it was "a good time to start a new venture." Bains testified:

> Q. [APPELLEES' TRIAL COUNSEL:] Well, let me ask you, why did you specifically set it up for June 30, 2008?
>
> A. [BAINS:] My father, you know, he's from the old country and such, and just like the Farmer's Almanac, you know, they have good days, bad days and those type of things. And for some reason, he talked to somebody, a religious figure, and he said, you know, a good time to start a new venture is on June 30 between 10 and 1:00 or something. And that is the reason why—in fact, on that day I set up two corporations, one for Four Seasons, and then I had also been contemplating extending the business and getting into something beside construction.
>
> So I was in the process of purchasing a smoothy factory. So this happened a long time before, but just to honor his

2. Bains testified as follows:
> Q. [DOYLE'S COUNSEL:] Okay. And KBI was a successful business, wasn't it?
> A. [BAINS:] No, it was not.
> Q. Okay. Well, but actually it was so successful that it was able to make you over a

hundred thousand in salary profit distribution in 2007, a year that ended just six months before you shut the company down, right? Isn't that true?
> A. That is right.

wishes, I kept it for that June 30 when I opened two corporations that same day.

Doyle suggests there is evidence in the record of seven of the badges of fraud noted earlier: the transfer was to an insider (§ 24.005(b)(1)); the debtor retained possession or control of the property transferred after the transfer (§ 24.005(b)(2)); the transfer or obligation was concealed (§ 24.005(b)(3)); before the transfer was made or obligation incurred, the debtor had been sued or threatened with suit (§ 24.005(b)(4)); the transfer was of substantially all of the debtor's assets (§ 24.005(b)(5)); the value of the consideration received by the debtor was not reasonably equivalent to the value of the assets transferred or the amount of the obligation incurred· (§ 24.005(b)(8)); and the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred (§ 24.005(b)(9)). But her argument focuses on three of the badges of fraud, specifically (5), (8), and (9), that she contends were established by the evidence.

The record shows that Elegant paid KBI a total of $10,635 for KBI's assets. Bains testified that he went to Carmax on September 30, 2008, to get an appraisal of KBI's 2004 Ford F–150 pickup truck, and that the appraised value was $4000.[3] Bains sold the Ford to Elegant for $4000 on October 3, 2008. Bains also testified that Elegant purchased KBI's Dodge Dakota pickup truck on February 3, 2009, for $1878. Bains said he "went to the newspaper to get the value of the Dakota" because Carmax "refused to appraise it," and that, based on the body damage to the vehicle and its mileage, he determined it was worth "anywhere from $1500· to $2000." Bains testified that Elegant purchased KBI's furniture, some desks, and a cabinet on February 6, 2009 for $1500, and Elegant purchased KBI's computer and desk on November 10, 2008 for $3257. All of these purchases were made by checks from Elegant to KBI, which were admitted into evidence.

Bains testified that Elegant did not purchase KBI's "goodwill"[4] because KBI did not have any quantifiable goodwill. Asked, therefore, to explain how, "as a brand-new business," Elegant was able to pay him $10,000 "by late September 2008," and why, in October of 2008, Elegant's bank statement reflected deposits of $58,000, Bains testified this was partially due to increased sales. Bains noted that he hired a salesperson who had previously owned "his own company" and that, after he joined Elegant, the salesperson received "a call from one of the old leads he had been working with[,] and they wanted to have him go ahead and sell them a sunroom." The salesperson explained to them he was "no longer in business[,] so he gave [Bains] that lead." Bains also pointed out that Elegant received more franchise territories and, thus, made more

---

3. The written appraisal from Carmax for "JP Bains," which was admitted into evidence, showed the mileage on the Ford was 145,842.

4. Goodwill is a protectable, valuable interest, and parties may determine its value and contract for its sale. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 777 (Tex.2011) ("Texas law has long recognized that goodwill, although intangible, is property and is an integral part of the business just as its physical assets are."). "Goodwill is defined as a 'business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp[ecially] for purchase; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets.'" *Heritage Operating, L.P. v. Rhine Bros., LLC*, No. 02–10–00474–CV, 2012 WL 858583, at *3 (Tex.App.-Ft. Worth, March 5, 2012, no pet.) (mem. op., not designated for publication) (quoting BLACK'S LAW DICTIONARY 763 (9th ed.2009)).

sales after it promised to sell and market only Four Seasons products. Bains admitted he had not "done business with KBI since July of 2008," but he also testified that, in 2009, and as recently as 2010, Elegant "had projects going on" for KBI and performed "service calls" for some products that had been sold through KBI. Bains estimated his combined salary for KBI and Elegant in 2008 was $60,000, because both companies were struggling. Bains further testified that, at the time of trial, KBI had assets of approximately $607, although he was not sure about the precise amount.

Doyle did not present any evidence contesting the value of KBI's Ford F–150, Dodge Dakota, or its computer, office furniture, and equipment. She also failed to present evidence regarding the value, if any, of KBI's goodwill, or that any goodwill of KBI was transferred to Elegant without reasonably equivalent value in exchange for the transfer or obligation. As the fact finder, the trial court was the judge of the weight and credibility of Bains's testimony, so we defer to the trial court's determination. After reviewing the evidence under the appropriate standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's findings that Bains did not conspire with Elegant or engage in any fraudulent transfer to Elegant. We overrule Doyle's first issue.

### *"Sham Corporation"*

In her second issue, Doyle asserts the trial court erred by failing to grant judgment in her favor based on her claim of "sham corporation." We likewise construe this as a challenge to the trial court's fifth finding of fact, which found Bains was not the "alter-ego" of Elegant Interiors. *See City of Pasadena*, 125 S.W.3d at 691; *see also* TEX.R.APP. P. 38.1(f), 38.9.

Corporations are separate legal entities from their shareholders, officers, and directors. *Penhollow Custom Homes, LLC v. Kim*, 320 S.W.3d 366, 372–373 (Tex.App.-El Paso 2010, no pet.); *Sparks v. Booth*, 232 S.W.3d 853, 868 (Tex. App.-Dallas 2007, no pet.). A fundamental principle of corporate law is that individuals can incorporate a business and thereby normally shield themselves from personal liability for the corporation's contractual obligations. *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex.2006); *Penhollow*, 320 S.W.3d at 372; *Sparks*, 232 S.W.3d at 868. Under section 21.223(a)(2) of the Texas Business Organizations Code, a shareholder may not be held liable to the corporation or its obligees with respect to any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the shareholder is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory. TEX. BUS. ORGS.CODE ANN. § 21.223(a)(2)(West 2009); *Willis*, 199 S.W.3d at 272 *Penhollow*, 320 S.W.3d at 372. Section 21.223(b) provides that the statutory limitation on a shareholder's liability under subsection (a) does not protect the shareholder if the obligee demonstrates the shareholder caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the shareholder. TEX. BUS. ORGS.CODE ANN. § 21.223(b); *Willis*, 199 S.W.3d at 272. This principle is often referred to as "piercing the corporate veil." *Sparks*, 232 S.W.3d at 868 (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 278 (Tex.1986)) (partially superseded by § 21.223(a)(2)); *see also Penhollow*, 320 S.W.3d at 372. Liability of a shareholder for a contractual corporate obligation that is limited by section 21.223 "is exclusive

**458**

and preempts any other liability imposed for that obligation under common law or otherwise." TEX. BUS. ORGS.CODE ANN. § 21.224; *Willis*, 199 S.W.3d at 272.

 Alter ego is one theory used to pierce the corporate veil. *Sparks*, 232 S.W.3d at 868 (citing *Castleberry*, 721 S.W.2d at 272); *see also Penhollow*, 320 S.W.3d at 372. That theory may be applied if there is a unity between the corporation and the individual to the extent the corporation's separateness has ceased, and holding only the corporation liable would be unjust. *Penhollow*, 320 S.W.3d at 372; *Sparks*, 232 S.W.3d at 868. As proof of alter ego, courts may consider (1) the payment of alleged corporate debts with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate. *Mancorp Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex.1990); *Penhollow*, 320 S.W.3d at 372; *Sparks*, 232 S.W.3d at 868. Under section 21.223(a)(3), the failure of a corporation to observe any corporate formality is no longer a factor in considering whether alter ego exists. TEX. BUS. ORGS.CODE ANN. § 21.223(a)(3); *Penhollow*, 320 S.W.3d at 372; *Sparks*, 232 S.W.3d at 868–69. An individual's standing as an officer, director, or majority shareholder of an entity is, in and of itself, insufficient to support a finding of alter ego. *Penhollow*, 320 S.W.3d at 372–73; *Sparks*, 232 S.W.3d at 869.

 In this case, the trier of fact could have inferred from the evidence that Bains, as the sole owner of Elegant, had complete control over it. Yet mere control and ownership of all the stock of a corporation is not a sufficient basis for ignoring the distinction between the shareholder

and the corporate entity. *See Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex.1997); *Penhollow*, 320 S.W.3d at 372–73. The record does not support Doyle's assertion that Elegant was nothing more than a "sham corporation." There is no evidence Elegant was organized and operated as a mere tool or business conduit of Bains, nor is there evidence Elegant's property was not kept separate from Bains's personal property, or that Elegant was used for his personal purposes. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding. We overrule Doyle's second issue.

The trial court's judgment is affirmed.