**Reversed; Dismissed in part and Remanded in part; Opinion Filed January 21, 2020**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-19-01177-CV

**VENATOR MATERIALS PLC, SIMON TURNER, KURT D. OGDEN,
STEPHEN IBBOTSON, RUSS R. STOLLE, HUNTSMAN CORPORATION,
HUNTSMAN INTERNATIONAL LLC,
HUNTSMAN (HOLDINGS) NETHERLANDS B.V.,
CITIGROUP GLOBAL MARKETS INC.,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
GOLDMAN SACHS & CO. LLC, AND J.P. MORGAN SECURITIES LLC, Appellants
V.
MACOMB COUNTY EMPLOYEES' RETIREMENT SYSTEM AND
FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, Appellees**

**On Appeal from the 134th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-19-02030**

## MEMORANDUM OPINION
Before Justices Bridges,[1] Osborne, and Carlyle
Opinion by Justice Osborne

In this suit alleging securities fraud, the trial court denied appellants' pleas to the jurisdiction and their venue challenges. Appellants seek reversal of both rulings in this accelerated interlocutory appeal. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7) (interlocutory appeal of order granting or denying special appearance); TEX. CIV. PRAC. & REM. CODE § 15.003(b) (interlocutory appeal of venue determination). We reverse the challenged orders. We dismiss appellees' claims

---

[1] Justice Schenck heard oral argument when this appeal was submitted, but did not participate in this opinion or judgment. Justice Bridges has reviewed the briefs and record and the recorded oral argument and participates in this opinion and the Court's judgment.

against appellants Venator Materials PLC, Simon Turner, Kurt Ogden, Stephen Ibbotson, Russ Stolle, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Goldman Sachs & Co. LLC, and J.P. Morgan Securities LLC for lack of personal jurisdiction. We remand the case for the trial court to enter an order transferring appellees' claims against appellants Huntsman Corp., Huntsman International LLC, and Huntsman (Holdings) Netherlands B.V. to Montgomery County.

## BACKGROUND

Appellee Macomb County Employees' Retirement System ("Macomb") and appellee Firemen's Retirement System of St. Louis ("Firemen") filed this class action on behalf of purchasers of securities in appellant Venator Materials PLC ("Venator"). Two securities offerings are at issue, an initial public offering on August 3, 2017 (the "IPO"), and a secondary offering on November 30, 2017 (the "SPO"). In the IPO, Venator was "spun off" from appellant Huntsman Corp., and Huntsman Corp. received all of the proceeds from the offerings. Macomb and Firemen allege that appellants "sold over $1 billion worth of Venator ordinary shares at prices as high as $22.50 per share." They also allege that appellants Citigroup Global Markets, Inc. ("Citigroup Global"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), Goldman Sachs & Co. LLC ("GS&Co."), and J.P. Morgan Securities LLC ("JPMS"), underwriters for the offerings, "received tens of millions of dollars in fees," and that Venator's executives "were compensated for their role in taking [Venator] public."

Venator is incorporated under the laws of England and Wales. Its principal place of business is in Wynyard, United Kingdom. A manufacturer of chemical products, Venator's primary product is titanium dioxide. Venator produced this product in eight manufacturing facilities in Europe, North America, and Asia, including a facility in Pori, Finland. In January 2017, there was a fire in the Pori plant. Macomb and Firemen allege that in the subsequent IPO

–2–

and SPO, appellants failed to disclose the extent of the damage to the plant and its effect on Venator's ability to produce titanium dioxide in the future. Because of the extensive damage from the fire, Venator ultimately abandoned the Pori plant, losing 13 percent of its titanium dioxide production capacity. By late 2018, Venator's share price had fallen to $3.65 per share.

Macomb and Firemen allege that they purchased shares in the IPO and the SPO "and [were] damaged thereby." Neither Macomb nor Firemen is incorporated in Texas or has its principal—or any—place of business here.

Individual appellants Simon Turner, Kurt D. Ogden, Stephen Ibbotson, and Russ R. Stolle, all officers or directors of Venator at the time of the offerings, do not live or work in Texas. They are residents of the United Kingdom. Immediately before the IPO, however, Ogden and Stolle were living in Texas and working for a Huntsman affiliate. The IPO prospectus reflects that Stolle and Ogden signed relocation agreements with Venator in June and July 2017, respectively, with their assignments to begin in Wynyard, United Kingdom on August 1, 2017.

Corporate appellants Venator, Citigroup Global, Merrill, GS&Co., and JPMS are not Texas corporations and do not have their principal places of business in Texas. Venator was incorporated in the United Kingdom and has its principal place of business there. Citigroup Global, Merrill, GS&Co., and JPMS (together, the "Underwriters") were incorporated in New York or Delaware and have their principal places of business in New York.

Appellants Huntsman (Holdings) Netherlands B.V. ("HHN") and Huntsman International LLC are wholly-owned subsidiaries of appellant Huntsman Corp. HHN and Huntsman International were the selling shareholders in the IPO. HHN was the selling shareholder in the SPO. Huntsman Corp. and Huntsman International maintain their principal executive offices and principal places of business in The Woodlands, Montgomery County, Texas. HHN is a private limited liability company incorporated under the laws of the Netherlands, and its registered office

–3–

and "official seat" are in Rotterdam, the Netherlands. The Huntsman entities and Venator offered evidence that they do not have offices in Dallas County, they took no actions with respect to the IPO or the SPO in Dallas County, they have no employees based in Dallas County, and documents, records, or files relevant to this case are located in Montgomery County, not Dallas County.

In their operative petition, Macomb and Firemen allege claims for violations of sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933. 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77o. Because Macomb and Firemen have filed a class action alleging untrue statements or omissions of material fact in connection with their purchase of Venator shares, they may not assert claims based upon Texas statutory or common law. *See* 15 U.S.C. § 77p(b).

Venator, Citigroup Global, Merrill, GS&Co., JPMS, Turner, Ibbotson, Ogden, and Stolle filed special appearances. Venator, Huntsman Corp., Huntsman International, and HHN filed a motion to transfer venue to Montgomery County. Turner, Ibbotson, Ogden, and Stolle filed joinders to the motion to transfer venue, subject to their special appearances. The trial court heard and denied all of the special appearances and the motion to transfer venue. This accelerated appeal followed.

## ISSUES

The twelve appellants have filed five initial briefs. Four of the five briefs, filed by (1) Ogden and Stolle, (2) Ibbotson and Turner, (3) Venator, and (4) the Underwriters, challenge the trial court's exercise of personal jurisdiction. The Huntsman entities contend that there is no basis for maintaining venue in Dallas County, or in the alternative, that Macomb and Firemen have not met their burden to prove that venue is proper in Dallas County.

## STANDARDS OF REVIEW

The question whether a court has personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142,

150 (Tex. 2013). When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by the evidence. *Id.*

In an interlocutory appeal of a trial court's determination that a plaintiff did or did not independently establish proper venue, we "determine whether the trial court's order is proper based on an independent determination from the record and not under either an abuse of discretion or substantial evidence standard." TEX. CIV. PRAC. & REM. CODE § 15.003(c)(1).

### DISCUSSION

Appeals from the trial court's special appearance and venue rulings are accelerated. *See* TEX. CIV. PRAC. & REM. CODE § 15.003(c)(2) (court of appeals must render judgment not later than the 120th day after appeal is perfected of venue ruling under § 15.003(a)); TEX. R. APP. P. 28.1 (accelerated appeal of interlocutory orders when allowed by statute, here, TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7)). Although the time period for disposition of the venue question is shorter, we must address the jurisdictional question first. If appellants lack the requisite minimum jurisdictional contacts with Texas to be subject to general or specific personal jurisdiction in this forum, we must render judgment dismissing Macomb's and Firemen's claims. *See, e.g., Crossroads Fin., LLC v. A.D.I.M. Global Co., Ltd.*, No. 05-16-00486-CV, 2016 WL 7220970, at *10 (Tex. App.—Dallas Dec. 13, 2016, no pet.) (mem. op.) (reversing and rendering judgment of dismissal after concluding defendant lacked minimum contacts to be subject to personal jurisdiction in the forum).

We note at the outset that the Huntsman entities challenge only the trial court's venue ruling. They did not file a special appearance challenging the trial court's personal jurisdiction over them.

–5–

# I. PLEAS TO THE JURISDICTION

## A. Applicable Law

Texas courts may exercise personal jurisdiction over a nonresident defendant if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The Texas long-arm statute provides in relevant part that "in addition to other acts that may constitute doing business," a nonresident does business in Texas if the nonresident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state, or if the nonresident commits a tort in whole or in part in this state. TEX. CIV. PRAC. & REM. CODE § 17.042(1), (2). The long-arm statute "reach[es] as far as the federal constitutional requirements of due process will allow." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

"[W]hether a trial court's exercise of jurisdiction is consistent with due process requirements turns on two requirements: (1) the defendant must have established minimum contacts with the forum state; and (2) the assertion of jurisdiction cannot offend traditional notions of fair play and substantial justice." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "[S]ufficient minimum contacts exist when the nonresident defendant 'purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws.'" *Id.* at 66–67 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). In *Searcy*, the court explained: "[t]he nub of the purposeful availment analysis is whether a nonresident defendant's conduct in and connection with Texas are such that it could reasonably anticipate being haled into court here."

*Id.* at 67. The defendant must purposefully direct contacts into the forum state. *Id.* (citing *Guardian Royal Exch.*, 815 S.W.2d at 228).

When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person; (2) the contacts relied upon must be purposeful rather than random, isolated, or fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 70–71 (Tex. 2016). This analysis assesses the quality and nature of the contacts, not the quantity. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 151. A defendant will not be haled into a jurisdiction based solely on contacts that are random, isolated, or fortuitous, or on the unilateral activity of another party or a third person. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005); *Guardian Royal Exch.*, 815 S.W.2d at 226.

In addition to minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 154 (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). "If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Id.* at 154–55. This evaluation is undertaken in light of the following factors, when appropriate:

> (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations or states in furthering fundamental substantive social policies.

*Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010) (internal quotations and citations omitted).

The plaintiff and the defendant bear shifting burdens of proof in a challenge to personal jurisdiction. *Mitchell v. Freese & Goss, PLLC*, No. 05-15-00868-CV, 2016 WL 3923924, at \*3 (Tex. App.—Dallas July 15, 2016, pet. denied) (mem. op.). The plaintiff bears the initial burden of pleading allegations that suffice to permit a court's exercise of personal jurisdiction over the nonresident defendant. *Searcy*, 496 S.W.3d at 66; *Assurances Generales Banque Nationale v. Dhalla*, 282 S.W.3d 688, 695 (Tex. App.—Dallas 2009, no pet.). As we explained in *Dhalla*, "[t]his minimal pleading requirement is satisfied by an allegation that the nonresident defendant is doing business in Texas." *Dhalla*, 282 S.W.3d at 695. Once the plaintiff has met this burden, the defendant then assumes the burden of negating all potential bases for personal jurisdiction that exist in the plaintiff's pleadings. *Searcy*, 496 S.W.3d at 66. "If the nonresident defendant produces evidence negating personal jurisdiction, the burden returns to the plaintiff to show, as a matter of law, that the court has personal jurisdiction over the nonresident defendant." *Dhalla*, 282 S.W.3d at 695.

The defendant can negate jurisdiction on either a factual or legal basis. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). A defendant negates jurisdiction on a factual basis by presenting evidence to disprove the plaintiff's jurisdictional allegations. *Id.* "The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id.* (footnotes omitted). A defendant negates jurisdiction on a legal basis by showing that "even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that

the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.*

A defendant's contacts with a forum may give rise to either general or specific jurisdiction. *KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 392 (Tex. App.—Dallas 2012, no pet.). Macomb and Firemen allege that general jurisdiction exists over Venator and the individual defendants, and that specific jurisdiction exists over all of the defendants who filed special appearances.

### 1. General jurisdiction

When a defendant's continuous operations within a state are "'so substantial and of such a nature as to justify a suit against it on causes of action arising from dealings entirely distinct from those activities,'" a court may exercise general jurisdiction over the defendant. *Searcy*, 496 S.W.3d at 71 (quoting *Int'l Shoe Co.*, 326 U.S. at 318). "[M]ore recent Supreme Court cases have clarified that the general jurisdiction analysis entails a high bar." *Id.* at 72. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (internal quotation omitted). "Courts do not have general jurisdiction over corporate defendants that are neither incorporated in the forum state nor have their principal place of business there, absent some relatively substantial contacts with the forum state." *Searcy*, 496 S.W.3d at 72 (citing *Daimler AG*, 571 U.S. at 138–39).

"[A] court has general jurisdiction over a defendant only if its 'affiliations with the [s]tate are so continuous and systematic as to render it *essentially at home* in the forum [s]tate.'" *Id.* (quoting *Daimler AG*, 571 U.S. at 138–39, emphasis added in *Searcy*). "Continuous and systematic contacts that fail to rise to this relatively high level are insufficient to confer general jurisdiction over a nonresident defendant." *Id.* (citing *Daimler AG*, 571 U.S. at 138–39). The relevant time

period for assessing contacts for purposes of general jurisdiction ends at the time suit is filed. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 169–70 (Tex. 2007).

### 2. Specific jurisdiction

Specific jurisdiction is based on "whether the defendant's activities in the forum state themselves 'give rise to the liabilities sued on.'" *Searcy*, 496 S.W.3d at 67 (quoting *Int'l Shoe*, 326 U.S. at 317). Specific jurisdiction exists when the plaintiff's claims "arise out of" or are "related to" the defendant's contacts with the forum. *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9 (1984)). The defendant's relationship with the forum state, not the plaintiff's relationship, is the proper focus of the specific jurisdiction analysis. *Id*. Courts must consider the relationship between the defendant, the forum state, and the litigation. *Id.*

"'[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation.'" *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 156 (quoting *Moki Mac River Expeditions*, 221 S.W.3d at 585). "'[B]ut-for causation alone is insufficient.'" *Leonard v. Salinas Concrete, LP*, 470 S.W.3d 178, 188 (Tex. App.—Dallas 2015, no pet.) (quoting *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 157). "'The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction.'" *Id*. (quoting *Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 357 (Tex. App.—Dallas 2013, no pet.)). We analyze specific jurisdiction on a claim-by-claim basis, unless we are shown that all claims arise from the same contacts with Texas. *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 150.

### 3. Plaintiffs' claims

In our specific jurisdiction analysis, we look to the operative facts of the causes of action pleaded by the plaintiffs. *See id.* at 156. Macomb's and Firemen's claims arise under sections 11, 12, and 15 of the federal Securities Act of 1933 (the "Securities Act"). 15 U.S.C.A. §§ 77k (Civil

liabilities on account of false registration statement); 77*l* (Civil liabilities arising in connection with prospectuses and communications); 77*o* (Liability of controlling persons). In this putative class action, Macomb and Firemen do not allege any Texas statutory or common law claims. *See* 15 U.S.C.A. § 77p(b) (class action limitations; "[n]o covered class action based upon the statutory or common law of any State . . . may be maintained in any State or Federal court by any private party alleging–(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security . . . ."); *see also Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1067 (2018) ("So taken all in all, § 77p(b) completely disallows (in both state and federal courts) sizable class actions that are founded on state law and allege dishonest practices respecting a nationally traded security's purchase or sale.").

"Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications. *Id.* Section 15 creates liability for individuals or entities that control any person liable under section 11 or 12; consequently, "the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12." *Id.*

In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 178–79 (2015), the Supreme Court explained that the Securities Act protects investors by ensuring that companies issuing securities make a "full and fair disclosure of information" relevant to a public offering. Section 11 promotes compliance with the Securities Act's disclosure requirements by giving purchasers a right of action against the issuer or designated individuals for material misstatements or omissions in registration statements. *Id.* at 179. As the Court explained:

Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out. Either way, the buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud.

*Id.* Section 11 authorizes suit against every person who signed the registration statement or was a director of the issuer or was an underwriter. Securities Act § 11(a)(1)–(5). In an earlier case, the Court explained that "Section 11 places a relatively minimal burden on a plaintiff":

If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements. Other defendants bear the burden of demonstrating due diligence.

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (footnotes omitted).

Section 12(a)(2) "provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Morgan Stanley Info. Fund*, 592 F.3d at 359. Section 12(a)(2) imposes liability on "[a]ny person" who offers or sells a security:

by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission . . . .

15 U.S.C. § 77*l*(a)(2). Section 12 "has a broader reach than section 11," because it extends liability to additional potential defendants. *See In re Plains All Am. Pipeline, L.P. Secs. Litig.*, 307 F. Supp. 3d 583, 618 (S.D. Tex. 2018) (discussing "statutory sellers" liable under § 12(a)(2)). In *Morgan Stanley Information Fund*, the court explained:

Claims under sections 11 and 12(a)(2) are therefore Securities Act siblings with roughly parallel elements, notable both for the limitations on their scope as well as the *interrorem* nature of the liability they create. Issuers are subject to virtually absolute liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence. Moreover, unlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of

–12–

1934, plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation.

*In re Morgan Stanley Info. Fund*, 592 F.3d at 359 (internal quotations, citations, and footnote omitted).

Under section 15, "anyone who controls persons liable under § 11 or § 12 of the Securities Act can be held jointly and severally liable to the same extent as the persons they control." *In re Plains All Am. Pipeline, L.P.*, 307 F. Supp. 3d at 618 (internal quotation omitted). Control-person liability under section 15 "is secondary or derivative, dependent on the plaintiff demonstrating an underlying 'primary' violation." *Id.*

### 4. Sufficiency of appellants' declarations

We must address one additional matter before undertaking our jurisdictional analysis. Macomb's appellate brief contains extensive argument about the sufficiency of the declarations filed in support of appellants' special appearances. Macomb and Firemen also moved to file supplemental briefing on this issue, contending that appellants' reply briefs "raised, for the first time, an argument that Plaintiffs had waived certain arguments regarding the insufficiency of the declarations filed in support of Defendants' Special Appearances." Appellants opposed this request. We deny Macomb and Firemen's motion to file their supplemental brief because (1) the parties' initial briefing addresses at length the question whether the declarations are sufficient, and (2) we cautioned the parties in our order of October 29, 2019 that we would not extend the briefing deadlines set forth in that order, given the statutory requirement that this Court render judgment within 120 days.

The gravamen of Macomb's and Firemen's complaint in their initial brief is that some or all of the witnesses made statements "to the best of my knowledge" or "to the best of my

recollection."[2] But every declaration begins with the statement, "I am fully competent to make this Declaration, and all statements herein are true and correct and are within my personal knowledge," or "I have personal knowledge of the facts stated herein." And each witness included an explanation of the reasons for his personal knowledge. In Turner's declaration supporting his individual special appearance, for example, he stated that he is Venator's President and Chief Executive Officer, he has served in that capacity since June 21, 2017, and he directs Venator's operations from its principal place of business in Wynyard, United Kingdom. He explained that he performed work on the IPO and the SPO "primarily from the United Kingdom," and did not draft, approve, or personally sign the IPO or SPO materials in Texas. Although he stated that "[t]o the best of my knowledge, no 'drafting sessions' with underwriters present occurred in Texas, as alleged to have occurred in paragraph 39 of the Consolidated Petition," that qualification does not render the entire declaration insufficient.[3]

Macomb and Firemen rely on our opinion in *360-Irvine, LLC v. Tin Star Development, LLC* in support of their argument that the declarations are not made on personal knowledge. No. 05-14-00412-CV, 2015 WL 3958509, at *4 (Tex. App.—Dallas June 30, 2015, no pet.) ("Statements that are equivocal or are based on the affiant's 'best knowledge' and 'belief' do not indicate the affiant has personal knowledge."). In that case, however, in addition to the equivocal statements, the affidavit did not establish how the affiant had personal knowledge, and the trial court heard live testimony from another witness who did have personal knowledge and who

---

[2] Appellees also argue that unsworn declarations complying with section 132.001 of the civil practice and remedies code are insufficient to support special appearances. The cases they cite, however, do not address declarations complying with section 132.001. *See, e.g., Kytel Int'l Grp. v. Rent-A-Center, Inc.*, 132 S.W.3d 717, 719 (Tex. App.—Dallas 2004, no pet.) ("Kytel's special appearance was neither sworn nor verified"; no reference to § 132.001). Under civil procedure rule 120a, special appearance affidavits "shall be made on personal knowledge, shall set forth specific facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify." TEX. R. CIV. P. 120a.3. Section 132.001 permits use of an unsworn declaration "in lieu of a[n] . . . affidavit required by statute or required by a rule," with certain exceptions that do not apply here, and appellants' declarations comply with section 132.001's requirements. TEX. CIV. PRAC. & REM. CODE ANN. § 132.001(a)–(c). Consequently, we do not conclude that appellants' declarations made under penalty of perjury and in compliance with section 132.001's other requirements are insufficient as a matter of law to support their special appearances.

[3] We also note that Ogden, Ibbotson, and Stolle each made the same statement in their declarations that to the best of their knowledge, no drafting sessions with the Underwriters present occurred in Texas, and Macomb and Firemen did not present any evidence to the contrary to support their allegation.

–14–

contradicted the statements in the affidavit. *Id.* Appellants' declarations, in contrast, are not contradicted by other testimony and "disclose the basis on which the affiant has personal knowledge of the facts to which he attests." *Id.* We conclude that appellants' declarations were sufficient to negate the bases for personal jurisdiction alleged in the operative petition, as we discuss below. *See Kelly*, 301 S.W.3d at 659.

## B. Jurisdictional Analysis

Macomb's and Firemen's claims arise from the disclosures the appellants made—or failed to make—in the registration statements and prospectuses for the IPO and the SPO about the fire in Finland and its effect on Venator's business. Consequently, we examine whether each defendant's contacts with Texas have a "substantial connection" to the "operative facts"—the disclosures or omissions in the IPO and SPO registration statements and prospectuses—about the fire and its consequences. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 156. When determining personal jurisdiction, each defendant's contacts with the forum state must be assessed individually. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 52 (Tex. 2016).

### 1. Venator

Venator has been a United Kingdom company since its inception in 2017. It is incorporated under the laws of England and Wales as a public limited company, and its principal place of business is in Wynyard, United Kingdom. Its shares are traded on the New York Stock Exchange. Its operations are directed from the United Kingdom and its executive officers live there.

In his declaration in support of Venator's special appearance, Turner stated that Venator was formed after Huntsman "announced that it would separate its pigments and additives division into a new publicly traded company." He explained that "[b]efore the separation, Huntsman directed the operations of its pigments and additives division from the United Kingdom." Turner stated that "Venator does not have offices in Texas." Turner also explained, however, that

–15–

Venator's "indirect subsidiary" Venator Americas LLC ("VAM") maintains an office in The Woodlands, Montgomery County, Texas.

Venator is the issuer of the ordinary shares sold in the IPO and the SPO. According to the IPO prospectus, after the IPO, Venator "will be a stand-alone public company and Huntsman [Corporation], through one or more subsidiaries, including HHN, will be our controlling shareholder." The Huntsman entities sold Venator shares to the Underwriters, who in turn sold the shares on the New York Stock Exchange. The contract between the Huntsman entities and the Underwriters provided that "[p]ayment of the purchase price for, and delivery of certificates or security entitlements for" the securities "shall be made" at a specified address in New York, New York, at 9:00 a.m. New York City time. Turner stated that "Venator did not specifically target Texas in connection with the IPO and SPO. The roadshow presentations for the IPO and SPO took place in New York, Boston, Los Angeles, Chicago, Baltimore, and Pennsylvania; they did not take place in Texas."

### a. General jurisdiction

We first consider Macomb's and Firemen's allegation that general jurisdiction exists over Venator in Texas. Where a corporation does not have a principal place of business in Texas, is not incorporated in Texas, and has only limited contacts with Texas, it does not have "continuous and systematic contacts with Texas that rise to a level that renders it essentially at home in the Lone Star State." *Searcy*, 496 S.W.3d at 78. Although Venator's prospectus explains that Huntsman is to be the controlling shareholder of Venator after the IPO, that relationship alone is not sufficient to confer general jurisdiction over Venator in Texas. *See id.* ("Thus, subsidiaries that are totally unrelated to the forum state, its economy, and its laws, cannot be haled into that state's courts merely by virtue of their ownership, and their ownership alone."). As the Supreme Court has explained, foreign subsidiaries of a United States corporation are not "amenable to suit in state

–16–

court on claims unrelated to any activity of the subsidiaries in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011).

Macomb and Firemen rely on the contacts of VAM, the Huntsman entities, and Venator's individual officers to argue that Venator has the required continuous and systematic contacts with Texas to render the exercise of general jurisdiction appropriate. But "the party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities" must prove the allegation. *See PHC-Minden, L.P.*, 235 S.W.3d at 173. Macomb and Firemen have not made allegations or offered evidence to support disregarding the corporate structures of Venator, VAM, or the Huntsman entities. In *PHC-Minden, L.P.*, the court explained that "veil-piercing for purposes of liability ('substantive veil-piercing') is distinct from imputing one entity's contacts to another for jurisdictional purposes ('jurisdictional veil-piercing')." *Id.* at 174. The two theories involve different elements of proof. *Id.* Because personal jurisdiction involves constitutional due process considerations that may not be overridden by statutes or the common law, facts relevant to substantive veil-piercing may not be relevant to jurisdictional veil-piercing. *Id.* The court explained:

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*Id.* at 175 (quoting *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 799 (Tex. 2002)). Stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders is insufficient. *Id.* Courts should determine whether the subsidiary is "separate and distinct" from the parent for jurisdictional purposes, taking into account the amount of the subsidiary's stock owned by the parent, the existence of separate headquarters, the observance of corporate formalities, and the degree of the parent's control over

–17–

the general policy and administration of the subsidiary. *Id.* There must be "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Id*. at 176 (internal quotation omitted).

Under these standards, Macomb and Firemen have not alleged or offered proof that Venator should be "fused" with any of the Huntsman entities or VAM to impute those entities' Texas contacts to Venator for jurisdictional purposes. *See id.* at 175. Macomb and Firemen argue that because Venator's registration statements did not separate VAM's revenues and other financial information from Venator's, VAM's Texas contacts should be ascribed to Venator. But the fact that Venator's and VAM's financial statements were not separate is not proof that "the parent controls the internal business affairs of the subsidiary" or that "the corporate fiction should be disregarded to prevent fraud or injustice," especially where there is no allegation or evidence that VAM took any action in violation of the securities laws that could be attributed to Venator for purposes of this litigation. *See id.* We conclude that Macomb's and Firemen's allegations are insufficient to establish that VAM and Venator should be "fused" for jurisdictional purposes. *See id.*

In sum, Venator does not have continuous and systematic contacts with Texas that render it "essentially at home" in Texas. *See Daimler*, 571 U.S. at 138–39; *Searcy*, 496 S.W.3d at 72–73. We conclude that there is no general jurisdiction over Venator in Texas.

### b. Specific jurisdiction

For specific jurisdiction, we consider the relationship among Venator, Texas, and the litigation. *See Searcy*, 496 S.W.3d at 67. There must be a substantial connection between Venator's Texas contacts and the operative facts of the litigation. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 156. To prove Venator's liability, Macomb and Firemen must establish that Venator's registration

statements or its prospectuses contained untrue statements of material fact or material omissions about the Pori plant fire and its effect on Venator's business. *See* Securities Act §§ 11, 12.

The July 31, 2017 registration statement for the IPO was signed in The Woodlands, Texas by Stolle on behalf of Venator and as attorney-in-fact for Turner, Ogden, and Ibbotson.[4] The November 27, 2017 registration statement for the SPO was signed in the City of Wynyard, U.K. by Stolle on behalf of Venator and by Turner, Ogden, and Ibbotson as Venator's officers.

Macomb and Firemen allege that the IPO and SPO registration statements failed to disclose:

- "the true extent of the fire damage to Venator's Pori plant";

- "the cost to rehabilitate the facility";

- "the fact that the facility had been largely destroyed (and, as a result, 80% of its nameplate capacity permanently lost)"; and

- "the impact to Venator's business and operations as a result of the damage to the facility."

Macomb's and Firemen's petition details each of these allegations, quoting the IPO and SPO prospectuses and alleging that the statements made in them about the Pori fire were "materially false and misleading when made" because they failed to disclose "adverse facts that existed at the time" of the IPO and the SPO.

In the two causes of action alleged against Venator—for violations of sections 11 and 12 of the Securities Act—Macomb and Firemen allege that Venator is liable for the material misrepresentations and omissions in the IPO and SPO registration statements. Macomb and Firemen explicitly allege that their causes of action under sections 11 and 12 are "based solely on negligence and/or strict liability," and "do not allege that any of the Defendants committed

---

[4] Similarly, the form underwriting agreement included in the IPO and SPO filings lists a Texas address for notices to Venator, and Venator agreed to "receive service of process or other legal summons" in Texas for suits instituted in New York.

intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent." Consequently, Macomb and Firemen will prove their causes of action by proving the "adverse facts that existed at the time" of the IPO and SPO about the Pori fire and its effect on Venator's business, as they pleaded in their petition. These facts are not substantially connected to Texas. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 156.

The fire took place in Finland on January 30, 2017. The investigation of the fire and its aftermath necessarily would have taken place in Finland. Venator, a corporation organized under the laws of England and Wales as a public limited company on April 28, 2017, has its principal office in the United Kingdom. Before the IPO, Huntsman's titanium dioxide business that became Venator was conducted from the United Kingdom. Consequently, both before and after the fire and before and after the IPO, the business operations from which Macomb's and Firemen's claims arose were conducted from the United Kingdom. And as we discuss later in our review of the Underwriters' issues, the registration statements and prospectuses containing the allegedly false statements and omissions were prepared by New York or Delaware underwriters and filed in Washington, D.C.

Macomb and Firemen rely heavily on (1) the statement in both of the registration statements that Venator's "headquarters operations are conducted across two of our administrative offices: The Woodlands, Texas and Wynyard, U.K.," and (2) Stolle's signature on the IPO registration statement "in the City of the Woodlands, State of Texas" on behalf of Venator and the individual appellants. But the registration statements also state that Venator's principal office is in the United Kingdom and that Venator conducts a majority of its business operations outside the United States. In addition, the registration statements and all of the accompanying documents were directed outward—to regulators in Washington, D.C. and to potential investors nationwide— rather than as a purposeful availment of "the privilege of conducting activities within [Texas], thus

invoking the benefits and protections of [Texas's] laws." *Searcy*, 496 S.W.3d at 66–67. The alleged

misrepresentations and omissions were about events and actions that took place outside of Texas.

Macomb and Firemen also argue that "Texas courts have jurisdiction under § 22 of the

Securities Act" over Venator and all of the other appellants. Section 22(a) provides in part:

> The district courts of the United States and the United States courts of any Territory shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto, and, concurrent with State and Territorial courts, except as provided in section 77p of this title with respect to covered class actions, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter. Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

Securities Act § 22(a), 15 U.S.C. § 77v(a).

In *Kelly v. McKesson HBOC, Inc.*, the Superior Court of Delaware considered the question

whether the Securities Act's nationwide service of process provisions were available to plaintiffs

who had chosen "to pursue their securities act litigation in a state proceeding":

> The Securities Act of 1933 confers subject matter jurisdiction over federal claims to state courts and allows them to hear what has traditionally been matters considered by the federal courts. The Plaintiffs raise the issue of whether two provisions of this statute, one which confers concurrent jurisdiction, and one that provides for nationwide service of process, should be read jointly or separately. If they are read as separate, independent provisions, then the statute confers nationwide service of process only upon federal courts, but would allow the subject matter jurisdiction of the federal claim to remain in state court if the prerequisites of that state's long-arm statutes have been met.

*Kelly v. McKesson HBOC, Inc.*, No. CIV.A. 99C-09-265WCC, 2002 WL 88939, at *18 (Del.

Super. Ct. Oct. 18, 2002) (unpublished opinion). The court held that nationwide service of process

under Section 22(a) is not available to state court plaintiffs, reasoning that "the language of

[Securities Act § 22] reflecting service is clearly written in a federal context. The words 'district,'

not state, are used and clearly these references are to the federal judicial districts into which the federal court system is divided." *Id.* at 19. The court continued,

> If Congress had intended to preempt the requirements of service under state law, they could have easily done so in a clear and precise manner. They did not, and the Court must conclude that the drafters of the statute recognized the unique meaning of the word district and the limitations they were placing on the statute.

*Id.*; *see also Niitsoo v. Alpha Nat. Res., Inc.*, No. 12-C-149, 2015 WL 356970, at *4 (W. Va. Cir. Ct. Jan. 8, 2015) (trial order) (citing *Kelly* in support of its holding that plaintiff "cannot rely upon the nationwide service provisions of the Securities Act to obtain jurisdiction" over the defendants). Macomb and Firemen do not cite authority for the proposition that section 22 applies to state court proceedings. A sister court rejected a similar argument under the federal Racketeer Influenced and Corrupt Organization Act ("RICO"), concluding that the RICO long-arm statute does not apply to proceedings conducted in state courts even though state courts enjoy concurrent jurisdiction with federal courts over RICO claims. *Haught v. Agric. Prod. Credit Ass'n*, 39 S.W.3d 252, 257–58 (Tex. App.—Tyler 2000, no pet.). Absent authority to the contrary, we conclude that section 22(a) does not apply here.

We conclude that Venator's alleged violations of the Securities Act are insufficiently connected to Texas to confer specific jurisdiction over Venator in Texas. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 157. Having reached this conclusion, we need not address whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *See Ahrens & DeAngeli, P.L.L.C. v. Flinn*, 318 S.W.3d 474, 486 (Tex. App.—Dallas 2010, pet. denied) (pretermitting other issues after concluding that "the nature of the contacts does not show purposeful availment"). We sustain Venator's issue challenging the exercise of personal jurisdiction over it, and render judgment dismissing plaintiffs' claims against Venator.

**2. Ibbotson and Turner**

Ibbotson served as Vice President, Corporate Controller, and Principal Accounting Officer of Venator at the time of the IPO and the SPO. Ibbotson lives and works in the United Kingdom. He has never resided in Texas and owns no real or personal property here.

Turner is President and CEO of Venator. He lives and works in the United Kingdom. He has never resided in Texas, owns no property in Texas, does not have bank accounts in Texas, and does not pay income tax in the United States.

Ibbotson and Turner are not "at home" in Texas. *See Daimler AG*, 571 U.S. at 137. Consequently, there is no general jurisdiction over them in Texas. *See id.* ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . .").

Ibbotson's and Turner's signatures on Venator's IPO and SPO registration statements are the basis for Macomb's and Firemen's claims against them. *See* Securities Act §§ 11, 12(a)(2), 15(a) (liabilities arising in connection with registration statements and prospectuses, and liability of controlling persons). Ibbotson, however, offered evidence that he did not draft or approve the IPO or SPO materials in Texas. He did not perform any work on the IPO or the SPO in Texas. He did not market Venator's shares to Texas investors or sell any Venator shares in Texas. Turner offered evidence that he performed work on the IPO "primarily from the United Kingdom" and did not perform any work on the SPO in Texas. He did not draft or approve the IPO or SPO materials in Texas. The causes of action against Ibbotson and Turner are not based on Texas law, and there is no evidence of a connection between Texas and the statements made in the registration statements and prospectuses about the Pori fire and its effect on Venator's business.

Macomb and Firemen rely on other facts allegedly connecting Venator and all of the individual defendants to Texas:

- The prospectuses stated that Venator had consulted Texas legal counsel regarding "[t]he validity of our ordinary shares offered by this prospectus"

- Venator's financial statements were audited by the Houston office of an independent accounting firm

- Venator's annual general meeting of shareholders was held via satellite from a law firm's Texas offices

- Venator's agreements with Huntsman, including a separation agreement, a transition-services agreement, and a registration-rights agreement, included provisions regarding the application of Texas law or recited a Texas address for notices to Venator

Macomb and Firemen also argue that Venator and all of the individual defendants held Venator's annual general meeting of shareholders via satellite from Texas.[5] But these facts are not relevant to whether the prospectuses and registration statements "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading" about the effect of the Pori fire on Venator's business. *See* Securities Act §§ 11, 12(a)(2). Macomb and Firemen do not rely on any provisions of Venator's agreements with Huntsman as a basis for their claims against Ibbotson or Turner, nor is the advice of Venator's counsel or accountants at issue in this lawsuit. And the fortuitous location of a meeting held via satellite does not show Ibbotson's or Turner's purposeful availment of a Texas forum. *See, e.g., Old Republic Title Ins. Co. v. Bell*, 549 S.W.3d 550, 559 (Tex. 2018) (defendant's activities "must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court" [internal quotation omitted]).

Macomb and Firemen also rely on a special transaction bonus Turner received as a result of the Venator spin off. Turner's incentives and intent regarding the allegedly false statements in the registration statements and prospectuses, however, are not at issue. *See, e.g., In re Morgan*

---

[5] Macomb and Firemen also argue that all of the individual defendants "controlled and directed Venator's systematic and continuous contacts with Texas" by overseeing Venator's operations and administrative headquarters in Texas, hiring and firing Texas employees, and serving as "executives of Texas-based Huntsman for much of the relevant period." As with the other contacts alleged, these contacts did not give rise to Macomb's and Firemen's Securities Act claims.

*Stanley Info. Fund*, 592 F.3d at 359 (plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation).

Because there is no substantial connection between Texas and Ibbotson's or Turner's actions giving rise to Macomb's and Firemen's claims, there is no specific jurisdiction over Ibbotson or Turner in Texas. *See Searcy*, 496 S.W.3d at 67 (for specific jurisdiction, the defendant's activities in the forum state must give rise to the liabilities sued on). We sustain Ibbotson's and Turner's first issue and render judgment dismissing plaintiffs' claims against them.

### 3. Ogden and Stolle

Ogden served as Senior Vice President and Chief Financial Officer of Venator at the time of the IPO and SPO. He signed both registration statements. Ogden lives and works in the United Kingdom. In his declaration, Ogden stated that he does not own any real or personal property in Texas and does not maintain a residence in Texas. But the record reflects that before his assignment to the United Kingdom effective August 1, 2017, Ogden resided in Texas. The record reflects that he signed the IPO registration statement on July 31, 2017. By the date he signed the SPO registration statement, however, Ogden was a resident of the United Kingdom.

Stolle served as Senior Vice President, General Counsel, and Chief Compliance Officer of Venator at the time of the IPO and the SPO. In his special appearance, Stolle states that he resides in the United Kingdom. But the evidence in the record also shows that at the time he signed the IPO registration statement, Stolle resided in Texas, moving to the United Kingdom effective August 1, 2017, under a relocation agreement with Venator. The registration statements reflect that Stolle had been employed continuously at Huntsman in various capacities since 1994. Like Ogden, Stolle was no longer a Texas resident when he signed the SPO registration statement.

Macomb and Firemen argue that Ogden's and Stolle's former Texas residencies make the exercise of jurisdiction in Texas appropriate, especially because their relocation agreements

provide that their "employment will remain with Huntsman P&A Americas LLC (The Home Company)." Stolle's agreement states that his employment "shall continue to be governed by Texas and U.S. Law"; Ogden's agreement references only "USA law." Both agreements provide that "[w]hile on assignment, your Home Country/Location" will be The Woodlands, in the United States, and "your Host Country/Location" will be Wynyard, United Kingdom "for the purpose of managing your assignment details."

In *PHC-Minden, L.P.*, 235 S.W.3d at 169–70, the supreme court determined that "the appropriate time period for assessing contacts for purposes of general jurisdiction" continues until the date suit is filed. "[T]he incident made the basis of the suit should not be the focus in assessing continuous and systematic contacts—contacts on which jurisdiction over any claim may be based." *Id.* at 169. Instead, "contacts should be assessed over a reasonable number of years, up to the date suit is filed." *Id.* at 170. After August 1, 2017, until suit was filed in February and March 2019[6] and afterwards, Ogden and Stolle have resided in the United Kingdom, on assignment to Venator, a United Kingdom company. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 924. We conclude that Ogden and Stolle are not "at home" in Texas for purposes of general jurisdiction.

Next, we consider whether the operative facts of Macomb's and Firemen's claims have a substantial connection to Ogden's and Stolle's contacts with Texas. *See Searcy*, 496 S.W.3d at 67; *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 156. Ogden's and Stolle's liability under Securities Act sections 11, 12, and 15 arises from their signatures on the registration statements and their secondary liability as controlling persons. Their liability arises only under federal law, based on

---

[6] The record reflects that two separate shareholder class actions, filed on February 8, 2019 and March 4, 2019, respectively, were consolidated by the trial court on March 8, 2019.

"what the [registration] statement says" and "what it leaves out" about the Pori facility fire and its effect on Venator's business. *See Omnicare, Inc.*, 575 U.S. at 179; *see also see also Cyan, Inc.*, 138 S. Ct. at 1067 (15 U.S.C. § 77p(b) "completely disallows" sizeable class actions founded on state law alleging dishonest practices in the purchase or sale of nationally traded securities). As we have discussed, the pigments and additives business at issue was conducted from the United Kingdom both before and after the IPO and SPO. Even if the alleged misrepresentations and material omissions about the Pori fire were made from Texas, they were directed outward, to regulators in Washington, D.C. and to investors nationwide. *Cf. Searcy*, 496 S.W.3d at 67 (purposeful availment requires defendant to purposefully direct contacts into the forum state). By signing the registration statement in Texas, Ogden and Stolle did not seek any "benefit, advantage, or profit" by availing themselves of the Texas jurisdiction to invoke the protections of Texas's laws. *See Cornerstone Healthcare Grp. Holding, Inc.*, 493 S.W.3d at 70–71. And for the reasons we have discussed for Ibbotson and Turner, the transaction bonuses, meetings via satellite, and other matters cited by Macomb and Firemen as Texas contacts are not facts "on which the trial will focus to prove the liability" of Ogden or Stolle under Securities Act sections 11, 12, or 15. *See Leonard*, 470 S.W.3d at 188.

Because there is no substantial connection between Texas and Ogden's or Stolle's actions giving rise to Macomb's and Firemen's claims, there is no specific jurisdiction over Ogden or Stolle in Texas. *See Searcy*, 496 S.W.3d at 67 (for specific jurisdiction, the defendant's activities in the forum state must give rise to the liabilities sued on). We sustain Ogden's and Stolle's first issue and render judgment dismissing plaintiffs' claims against them.

### 4. The Underwriters

The Underwriters offered evidence that they are not Texas corporations and do not have their principal place of business here. Consequently, there is no general jurisdiction over the

Underwriters in Texas, as Macomb and Firemen apparently concede.[7] *See Daimler AG*, 571 U.S. at 139 (where entities were not incorporated in California and did not have their principal places of business there, they were not "at home" in California despite their activities there).

Regarding specific jurisdiction, we must consider whether there is a substantial connection between the operative facts of the litigation and the Underwriters' Texas contacts. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 156. Macomb and Firemen have alleged claims against the Underwriters under Securities Act sections 11 and 12. *See* Securities Act § 11(a)(5) (suit against underwriters for untrue statements or omissions of material fact in registration statement); *Id.* § 12(a)(2) (liability of persons who offer or sell securities by means of prospectus which includes untrue statement or omission of material fact). The Underwriters were involved in drafting the SEC registration statements and prospectuses at issue, and they performed due diligence in connection with the offerings. They prepared marketing materials to be used in "roadshows" during which Underwriter representatives traveled to different locations around the United States—not including Texas—to give presentations to potential investors. They purchased Venator shares delivered and paid for in New York, and sold Venator's shares to investors nationwide.

As we have discussed, the operative facts of the litigation are the allegedly false statements and material omissions in Venator's registration statements and prospectuses about the Pori fire and its consequences. For specific jurisdiction, there must be a substantial connection between these operative facts of the litigation and the Underwriters' Texas contacts. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 156. Macomb and Firemen rely on the Underwriters' agreement with Venator and the Huntsman entities—two of which have their principal places of business in Texas— regarding the offerings. But "[m]erely contracting with a Texas resident does not satisfy the minimum contacts requirement." *Internet Advertising Grp., Inc. v. Accudata, Inc.*, 301 S.W.3d

---

[7] We address the issue because some of the parties' briefing includes it.

383, 389 (Tex. App.—Dallas 2009, no pet.) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). As we explained in *Internet Advertising Group*, "[t]o evaluate purposeful availment, we look to such facts as prior negotiations, contemplated future consequences, terms of the contract and the parties' actual course of dealing to determine whether the defendant purposefully established minimum contacts with the forum." *Id.* (citation omitted).

> In the underwriting agreement, the parties agreed that:
>
> Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby ("Related Proceedings") shall be instituted in (i) the federal courts of the United States of America located in the City and County of New York, Borough of Manhattan or (ii) the courts of the State of New York located in the City and County of New York, Borough of Manhattan (collectively, the "Specified Courts"), and each party irrevocably submits to the exclusive jurisdiction . . . of such courts in any such suit, action or proceeding.

The parties also "irrevocably and unconditionally waive[d] any objection to the laying of venue of any suit, action or other proceeding in the Specified Courts." And in all capital letters, section 17 of the contract provides that "THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF, THE STATE OF NEW YORK WITHOUT REGARD TO ITS CHOICE OF LAW PROVISIONS." Although a choice of law provision, standing alone, is not sufficient to confer jurisdiction, it "warrants some weight in considering whether a defendant has purposefully invoked the benefits and protection of a state's law for jurisdictional purposes." *Internet Advertising Grp.*, 301 S.W.3d at 390. Here, the parties expressly chose New York law to govern their disputes rather than "purposefully invok[ing] the benefits and protection" of Texas law. *See id.* "[A] nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana Easy Livin' Country, Inc.*, 168 S.W.3d at 785.

Macomb and Firemen emphasize the contract's provision that notices to Venator and the Huntsman entities are to be sent to Texas addresses. But performance of the contract is to be completed elsewhere. The contract's payment provision requires payment of the purchase price and delivery of certificates for the securities at a specified address in New York, New York, "at 9:00 A.M. (New York City time)." Even if the contract required payment in Texas, "contracting with a Texas company and requiring payments in Texas do not alone necessarily establish sufficient minimum contacts to demonstrate specific jurisdiction." *Internet Advertising Grp.*, 301 S.W.3d at 389. The Underwriters' transmittal of notices under the contract "can hardly be termed significant in terms of determining purposeful availment of the benefits of the forum state's laws." *Id.*

The Underwriters also rely on several cases in which nonresidents who provided professional services under contracts with Texas residents lacked minimum contacts with Texas. In *Ahrens & DeAngeli, P.L.L.C.*, a Florida resident brought suit in Texas against Idaho and Washington attorneys and their law firm for false representations that induced him to enter into illegal tax shelter transactions. 318 S.W.3d at 480. The plaintiff alleged that the tax shelter transactions were created through the law firm's legal and business relationships with a Texas entity. *See id.* at 484. There was evidence of extensive communication between the law firm and the Texas entity about the tax strategy, and evidence that the law firm was compensated for its work. *See id.* at 483–86. But because the work of developing the tax strategy "was performed in Washington or Idaho, not Texas, and the communications about it were made from there to Texas," we concluded the attorneys and the law firm did not purposefully avail themselves of the benefits and protections of Texas law. *Id.* at 486; *see also Mitchell*, 2016 WL 3923924, at *4 ("Merely contracting with a Texas entity is insufficient to constitute purposeful availment for jurisdictional purposes, especially when the contractual obligations are performed outside the forum state.").

Macomb and Firemen argue that even if the Underwriters never entered Texas, they purposefully availed themselves of the privilege of conducting activities in Texas, thus invoking the benefits and protections of Texas law. *See Searcy*, 496 S.W.3d at 66–67 (discussing purposeful availment requirement). They rely on *Burger King Corp.*, *McGee v. International Life Insurance Co.*, and *Retamco Operating, Inc.* in support of their argument, explaining that in those cases, the defendants purposefully availed themselves of a jurisdiction even though they never physically entered the state. *See Burger King Corp.*, 471 U.S. at 476 (where defendant has created continuing obligations between himself and forum resident, jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State"); *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223–24 (1957) (jurisdiction in California over Texas corporation that sold life insurance policy by mail to California resident in California); *Retamco Operating, Inc.*, 278 S.W.3d at 339 (by taking assignment of Texas real property, defendant "reached out and created a continuing relationship in Texas"). These cases, however, do not involve express contractual provisions agreeing to jurisdiction, applicable law, and venue elsewhere. *Cf. McGee*, 355 U.S. at 221 (jurisdiction was based "on a state statute which subjects foreign corporations to suit in California on insurance contracts with residents of that State"); *Burger King*, 471 U.S. at 481–82 (jurisdiction in Florida existed where, among other factors, the parties' franchise agreement was "governed and construed under and in accordance with the laws of the State of Florida"); *Retamco Operating, Inc.*, 278 S.W.3d at 339 (jurisdiction was based on defendant's real property interests in Texas which allowed defendant to enjoy the benefit and protection of Texas laws).

As we have already discussed, Macomb and Firemen also argue that the Underwriters' declarations are too equivocal to negate the petition's allegations that the offerings were

"conduct[ed]" "from and in Texas"[8] because they include the phrase "to the best of my knowledge" when discussing where work took place on the offerings. They also argue that the Underwriters' work on the offerings was "Texas-directed" because prior to the IPO, the financial results of the pigments and additives segment were consolidated with Huntsman's other segments and reported by Huntsman from Texas, and the Underwriters were required to examine those financial reports in conducting their due diligence for the offerings. But the "operative facts"—the adequacy of the disclosures about the Pori fire and its consequences to Venator—are not facts connected to Texas. The Underwriters specifically structured their agreement with the Huntsman entities and Venator "so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana Easy Livin' Country, Inc.*, 168 S.W.3d at 785. We sustain the Underwriters' challenge to the trial court's denial of their special appearances and render judgment dismissing plaintiffs' claims against Citigroup Global, Merrill, GS&Co., and JPMS.

## II. VENUE

In two issues, the Huntsman appellants contend that venue is not proper in Dallas County. "Generally, the plaintiff chooses the venue of the case, and the plaintiff's choice cannot be disturbed if the suit is initially filed in a county of proper venue." *Union Pac. R.R. Co. v. Stouffer*, 420 S.W.3d 233, 239 (Tex. App.—Dallas 2013, pet. dism'd). "Once the defendant specifically challenges the plaintiff's choice of venue, the plaintiff has the burden to present prima facie proof that venue is proper in the county of suit." *Id.* As we explained in *Stouffer*,

> Plaintiff satisfies its burden of presenting prima facie proof when the venue facts
> are properly pleaded and an affidavit, and any duly proved attachments to the

---

[8] In their petition, Macomb and Firemen alleged that each Underwriter "conducts business in the state of Texas and Dallas, including but not limited to the sale and/or solicitation of Venator's ordinary shares through the IPO and SPO," and each "maintains main offices in Dallas." Macomb and Firemen argue that these allegations were sufficient to meet the "minimal pleading requirement" we described in *Dhalla*. *See Dhalla*, 282 S.W.3d at 695. As we have noted, each Underwriter responded by offering uncontroverted evidence that its principal place of business is in New York. The Underwriters also offered evidence that no roadshow presentations for the offerings took place in Texas, and the parties to the underwriting contract chose New York for applicable law, venue, and performance. Macomb and Firemen do not allege that they purchased Venator shares in Texas. Even under the "stream-of-commerce" theory of personal jurisdiction—where a nonresident may be subject to personal jurisdiction for placing a product into the stream of commerce with the expectation that it will be sold in the forum state—"mere knowledge that the product will be sold in the forum state is not enough." *TV Azteca*, 490 S.W.3d at 46.

affidavit, are filed fully and specifically setting forth the facts supporting such pleading. Generally, if the plaintiff fails to meet this burden, the trial court must transfer the lawsuit to another county of proper venue. In reviewing a venue decision, an appellate court conducts an independent review of the entire record to determine whether any probative evidence supports the trial court's venue decision.

*Id.* (internal quotation and citations omitted). Macomb and Firemen rely on civil practice and remedies code section 15.002(a)(3), providing that a lawsuit may be brought "in the county of the defendant's principal office in this state, if the defendant is not a natural person." TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3). In a suit with more than one plaintiff, "each plaintiff must, independently of every other plaintiff, establish proper venue." *Id.* § 15.003(a).

In their first issue, the Huntsman appellants argue that if the Underwriters are dismissed for lack of personal jurisdiction, then there is no basis for maintaining venue in Dallas County, and the trial court erred by denying their motion to transfer venue to Montgomery County. In their second issue, they argue that even if there is jurisdiction over the Underwriters, venue is not proper in Dallas County because none of the appellants maintains a "principal office" in Dallas County as defined in section 15.001(a) of the civil practice and remedies code.

Macomb and Firemen respond that (1) at least one of the Underwriters maintains a "principal office" in Dallas, and in any event, (2) venue is proper in Dallas County against the Huntsman defendants under section 22(a) of the Securities Act. Macomb and Firemen do not contend that any of the Huntsman entities have a principal office in Dallas County.

Because we have concluded that Macomb's and Firemen's claims against the Underwriters must be dismissed for lack of personal jurisdiction, we agree with the Huntsman parties that venue is not proper in Dallas County based on the location of the Underwriters' principal Texas offices. We also conclude that venue is not proper under Securities Act section 22(a). We have quoted and discussed section 22(a) with respect to jurisdiction, and conclude for the same reasons that the venue provisions of the Texas Civil Practice and Remedies Code apply where a plaintiff has chosen

–33–

to pursue its federal Securities Act claims in a Texas state court. *See Kelly*, 2002 WL 88939, at *18–19 (section 22 references only federal judicial "districts"). Although *Kelly* addressed the issue of nationwide service of process, not venue, Congress used the term "districts" in section 22 in reference to both process and venue. *See* Securities Act § 22(a); TEX. CIV. PRAC. & REM. CODE §§ 15.001–15.007 (venue, definitions and general rules).

We sustain the Huntsman appellants' first issue. We reverse the trial court's order denying the Huntsman appellants' motion to transfer venue.[9] We remand the cause for the trial court to enter an order transferring the case to Montgomery County.

CONCLUSION

We reverse the trial court's orders denying the special appearances of Venator Materials PLC, Simon Turner, Kurt D. Ogden, Stephen Ibbotson, Russ R. Stolle, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Goldman Sachs & Co. LLC, and J.P. Morgan Securities LLC, and render judgment dismissing appellees' claims against those appellants for lack of personal jurisdiction. We remand the case for the trial court to enter an order transferring appellees' claims against appellants Huntsman Corporation, Huntsman International LLC, and Huntsman (Holdings) Netherlands B.V. to Montgomery County.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

191177F.P05

---

[9] Although generally there is no interlocutory appeal from a trial court's venue determinations, *see* TEX. CIV. PRAC. & REM. CODE § 15.064(a), civil practice and remedies code section 15.003(b) permits an accelerated interlocutory appeal from a trial court's determination that "a plaintiff did or did not independently establish proper venue" under section 15.003(a) in a multiple-plaintiff case. We have explained that "in a multiple plaintiff case, an order denying a motion to transfer venue of the entire case is a determination that every plaintiff independently established proper venue. Such orders are subject to interlocutory appeal" under section 15.003(b)(1). *Union Pac. R. Co.*, 420 S.W.3d at 239. Consequently, we may review the trial court's ruling on the Huntsman parties' motion to transfer venue as well as its ruling that each plaintiff independently established proper venue. *See id.*



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

VENATOR MATERIALS PLC,
SIMON TURNER, KURT D. OGDEN,
STEPHEN IBBOTSON, RUSS R.
STOLLE, HUNTSMAN CORPORATION,
HUNTSMAN INTERNATIONAL LLC,
HUNTSMAN (HOLDINGS)
NETHERLANDS B.V.,
CITIGROUP GLOBAL MARKETS INC.,
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED,
GOLDMAN SACHS & CO. LLC, AND
J.P. MORGAN SECURITIES LLC,
Appellants

No. 05-19-01177-CV          V.

MACOMB COUNTY EMPLOYEES'
RETIREMENT SYSTEM AND
FIREMEN'S RETIREMENT SYSTEM OF
ST. LOUIS, Appellees

On Appeal from the 134th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-19-02030.
Opinion delivered by Justice Osborne;
Justices Bridges and Carlyle participating.

In accordance with this Court's opinion of this date, the trial court's orders of September 3, 2019 (1) denying the special appearances of appellants Kurt D. Ogden, Simon Turner, Stephen Ibbotson, Venator Materials PLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Goldman Sachs & Co. LLC, and J.P. Morgan Securities LLC, (2) denying the special appearance of appellant Russ R. Stolle, and (3) denying the motion of appellants Huntsman Corporation, Huntsman International LLC, and Huntsman (Holdings) Netherlands B.V. to transfer venue, are **REVERSED**.

The claims of appellees Macomb County Employees' Retirement System and Firemen's Retirement System of St. Louis against appellants Kurt D. Ogden, Simon Turner, Stephen Ibbotson, Russ R. Stolle, Venator Materials PLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Goldman Sachs & Co. LLC, and J.P. Morgan Securities LLC are **DISMISSED** for lack of jurisdiction.

This cause is **REMANDED** to the trial court to enter an order transferring appellees' claims against appellants Huntsman Corporation, Huntsman International LLC, and Huntsman (Holdings) Netherlands B.V. to Montgomery County.

It is **ORDERED** that appellants Kurt D. Ogden, Simon Turner, Stephen Ibbotson, Russ R. Stolle, Venator Materials PLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Huntsman Corporation, Huntsman International LLC, and Huntsman (Holdings) Netherlands B.V. recover their costs of this appeal from appellees Macomb County Employees' Retirement System and Firemen's Retirement System of St. Louis.

Judgment entered this 21st day of January, 2020.